## MURRAY v. ROBERTS et al.
### No. 198.

Circuit Court of Appeals, Second Circuit.
April 17, 1939.

890

Davies, Auerbach & Cornell, of New York City (Edward Cornell, H. C. Mc-Collom, and Orrin G. Judd, all of New York City, of counsel), for appellant Central Hanover Bank & Trust Co., as trustee.

Wright, Gordon, Zachry & Parlin, of New York City (Boykin C. Wright, Clifton Murphy, and Daniel James, all of New York City, of counsel), for Van S. Merle-Smith et al.

John J. Curtin, of New York City (Joseph H. Choate, Jr., David B. Tolins, and Winfield S. Palmer, all of New York City, of counsel), for Transit Commission, Metropolitan Division, Department of Public Service of the State of New York.

Miller, Owen, Otis & Bailly, of New York City (Carl M. Owen, James L. Quackenbush, Ralph Norton, and Mark F. Hughes, all of New York City, of counsel), for Thomas E. Murray, receiver of Interborough Rapid Transit Co.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Edwin S. S. Sunderland, Chester F. Leonard, and Charles H. Willard, all of New York City, of counsel), for Guaranty Trust Co. of New York, J. P. Morgan and others.

Shearman & Sterling, of New York City, for J. Herbert Case and others.

Bigelow & Beatty, of New York City, for Interborough Rapid Transit Co.

Louis Boehm, of New York City (Louis Boehm and Gabriel Rubino, both of New York City, and Hyman Eller, of Brooklyn, N. Y., of counsel), for Norman Johnson and others.

White & Case, of New York City (Jesse E. Waid, of New York City, of counsel), for Bankers Trust Co.

Eppstein & Hirshfield, of New York City (Ira W. Hirshfield, of New York City, of counsel), for Dwight F. Faulkner, Jr., and others.

Hughes, Richards, Hubbard & Ewing, of New York City (Charles E. Hughes, Jr., and Allen S. Hubbard, both of New York City, of counsel), for William Roberts.

Milbank, Tweed & Hope, of New York City (Carl V. Venters, of New York City, of counsel), for Chase Nat. Bank of City of New York.

John B. Doyle, of New York City, (Frank C. Laughlin, of New York City, of counsel), for Harold Palmer and others.

Hodges, Reavis, Pantaleoni & Downey, of New York City, for Nathan L. Amster et al.

Rayford W. Alley, of New York City, for William S. Kies et al.

William C. Chanler, of New York City (William G. Mulligan, Jr., of New York City, of counsel), for City of New York.

Charles Franklin, of New York City (Marcus L. Bell, William V. Hodges, and C. Frank Reavis, all of New York City, of counsel), for Manhattan Ry. Co.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

These appeals are from an order, entered in a general creditors' suit, which directed the receiver of the Interborough

Rapid Transit Company to reject a lease, granted by the Manhattan Railway Company of its elevated railroad in the City of New York; but to continue to operate trains over parts of the Interborough tracks, connecting with the Manhattan; and to give free transfers at one intersection of the two roads. The order also directed the receiver to affirm three contracts—Nos. 1, 2 & 3—between the Interborough and the City, and denied the petition of the City that the Interborough receiver be directed to operate the elevated road, and the petition of the receiver of the Manhattan Railway Company that he affirm the lease. Many parties filed answers, extended hearings were held, and the district court wrote a long opinion, which set out the facts in detail, and summarized the relevant documents. Nobody has questioned the accuracy of this statement with the exception of a single finding of fact; i. e., that the continued operation of the Manhattan would be a burden to the Interborough. Upon the argument only the Manhattan Company —not its receiver—challenged this finding; it asked us to withhold decision until the question can be decided. It is an issue on which the Manhattan should not be heard; it concerns only the internal policy of the creditors and shareholders of the Interborough, in which the Manhattan, as lessor, may not intervene: the determination whether to perform, or to leave the obligee to its remedies, is to be made solely in the interests of·the Interborough. It is indeed true that, as lessor, the Manhattan is a creditor, and that, as a creditor, it has an interest in the Interborough's assets, but since the Manhattan is also in the hands of a receiver, he must speak for its creditors. If he thinks it unwise to raise the issue, he cannot be forced to do so except by the court which appointed him, and that too in the Manhattan creditors' suit. No such application has been made in that suit.

■ We shall not repeat the facts so carefully stated by the district court; we presuppose a familiarity with them. We may start with the assumption that,. except for any obligations to the City, the performance of which would prevent his doing so, the Interborough receiver would be free to reject the Manhattan lease as his interest might dictate. That is perhaps not perfectly evident; the City's consent was necessary to the acquisition of the term in 1903, and it might be argued that that consent was also necessary to a divorce of the two systems. Broad River Power Co. v. South Carolina, 281 U.S. 537, 50 S.Ct. 401, 74 L.Ed. 1023; American Brake Shoe Company v. New York City Railways, unreported (S.D.N.Y. February 11, 1925). But the point has not been made, and we pass it: the first question for us is whether the Interborough entered into any covenants, express or implied, with the City which stand in the way of a rejection of the lease. At the outset we say that we see no substantial difference between the rights conferred by the documents of March, 1913, and franchises, stricti juris. Those granted by Contract No. 3 were leases, it is true, but during the term conveyed they included the right to occupy, and make use of, public streets, and that is in substance a franchise. The "Extensions Certificate" was in terms a franchise, though not in perpetuity; the "Joint Trackage Agreement" was at least a license; and the "Third Trackage Agreement" was also a franchise, though granted to the Manhattan, and, like the "Extensions Certificate", not in perpetuity. As to all these the considerations determining the City's rights of regulation and control, are the same as in the case of any other franchises.

■ The Interborough's only covenant to operate any part of the elevated lines, or to operate through trains over both the elevated and the subway, is to be found in Article IX of the "Extensions Certificate"; and that is limited to operation over the joint tracks and the "Extensions", although this was to be "to the end that through service may be provided" over the Manhattan as well. Article IX declares at its end that the "Joint Trackage Agreement" will specify in detail how this covenant shall be performed, and Article First of the "Joint Trackage Agreement" contains a variant of the concluding phrase, just quoted, which is as follows: "to the end that through service may be provided over such portions" (the joint ·tracks) "over such Railroads" (the "Extensions") "and, so long as the Grantee its successors or assigns shall operate the Manhattan Railroad, over such Manhattan Railroad". We must first ·decide whether this "so long as" clause limits the covenant in Article IX to the period during which the Interborough remains able to meet all its claims to its creditors; i. e.

to its solvency. Article First of the "Joint Trackage Agreement" is only a grant; it contains no covenant of the Interborough except as lessee of the tracks, to itself, as grantee of the joint track privilege—which is no covenant at all. The change was deliberately interpolated into it after the first draft was made, and it was not interpolated into Article IX of the "Extensions Certificate." This enables us to fix its purpose with some certainty: it was to insure against the Interborough's retention of the grant after it had for any reason ceased to operate the Manhattan; but it has nothing whatever to do with the duration of the covenant of Article IX of the "Extensions Certificate". If that had been intended it would have appeared in the text of that covenant. The contrast is conclusive. Moreover, even were it less clear, we should hesitate long before construing the language as giving the Interborough an option to end its obligation upon insolvency. It is in fact still able to operate the Manhattan, though the bargain has become onerous, has indeed become a very bad bargain. Yet it is a far cry from that to hold that the City meant, when granting new franchises, then supposed to be of great value, to allow the grantee to repudiate the consideration and disrupt the newly achieved transportation system, as soon as it was forced to peel off some of the junior claims against it. We hold therefore that the covenant to operate over the "Extensions" and the joint tracks is not limited to the period during which the Interborough may find it desirable to keep the lease, but that it bound the road during the existence of the "Extensions Certificate" and the "Joint Trackage Agreement."

Article IX does not, however, require the Interborough to operate trains over the Manhattan. Again, the words must prevail, and this interpretation is confirmed by Article XII of the "Extensions Certificate", which provides for a new division of profits, "if and when the Interborough Company ceases to operate the Railroads" (the "Extensions") "in conjunction with the Manhattan Railroads." Although this does indeed show that the covenant may last beyond the lease, there is no indication that performance is to change while the obligation continues; yet, if performance includes operation over the Manhattan, it must change in case the roads ever become separated. We do not forget the curious result of so interpreting Article IX, subjecting the Interborough, as that does, to the apparently futile duty of running trains from the junctions of the "Extensions" with the elevated tracks to the end of the joint tracks. That is not, however, so absurd as it seems, because, as we shall show later, although the obligation is limited, its performance will in practice compel the Interborough to keep possession of the Manhattan's third tracks, which will furnish a motive for the continuance of through service. This incentive may well have been thought adequate security, and it will probably be found to be so, nor does it seem to us that an agreement to operate over the Manhattan can be drawn from Article VI of the "Extensions Certificate". That merely limits the fare; and the parties knew how to commit the Interborough to an obligation when they wished to do so. If they meant to in Article VI, not only did they leave it to implication, but they extended the very deliberately limited locution of Article IX.

The next question is whether, if the receiver repudiates this obligation, the City can enforce it specifically, or is relegated to damages for the breach. In the first place, it is hard to see how it could prove any damages at all; the covenant was for the benefit of the public, and any loss would fall upon those who were deprived of the service: how they could prove their loss, does not appear; nor, if they could, how the City could sue for it on their behalf. Nevertheless, it does not follow that the obligation may be enforced specifically, merely because no damages are recoverable for its breach. The first and sufficient reason why it can be, is that the statute so provides—§ 9 (1) of the Rapid Transit Law, Laws 1909, c. 498. Moreover, quite aside from that section, we think that the obligor of a "mandatory" franchise may not shake itself free by insolvency. Certainly it is settled that performance may be enforced specifically against a solvent obligor. Columbus Railway P. & L. v. City of Columbus, 249 U. S. 399, 39 S.Ct. 349, 63 L.Ed. 669, 6 A.L. R. 1648; Georgia Power Co. v. City of Decatur, 281 U.S. 505, 50 S.Ct. 369, 74 L. Ed. 999; Bullock v. State ex rel. Railroad Commissioners, 254 U.S. 513, 521, 41 S.Ct. 193, 65 L.Ed. 330 (semble). It does not indeed follow that the same is

true in insolvency: a city has no priority for past due rentals upon a franchise. City and County of Denver v. Stenger, 8 Cir., 295 F. 809. Moreover, in Union Trust Co. v. Curtis, 182 Ind. 61, 105 N. E. 562, L.R.A.1915A, 699, the court allowed the property of a steam railway to be sold free of a covenant, made with a county, to operate the road and keep its shops in the county. As to this case, it should be observed that the contract to keep the shops in the county was scarcely part of any public service required of the road; and that the court apparently thought that operation by electricity was a practicable substitute for operation by steam. It is a doubtful authority against the view we take. Aside from it we have found no case excusing non-performance, unless indeed the road has come to such a pass that it cannot earn its expenses of operation. New York Trust Co. v. Portsmouth & Exeter St. R. Co., C.C., 192 F. 728; Jack v. Williams, C.C., 113 F. 823. We do not believe that even then the property may be withdrawn and the remnant salvaged, for reasons we shall give; but in any event that is not the situation at bar. Our reasons for this belief are these. Ordinarily the doctrine (which we shall discuss later) that failure to exploit a franchise will forfeit it, is sanction enough to insure performance; and in the case of "permissive" franchises the grantee is subject to no further control. If he is willing to throw up the whole franchise, he is free to retire. When, however, a franchise is made "mandatory", it is because this sanction is not thought to be sufficient guaranty, and the grantee must be understood irrevocably to dedicate the property to the performance of the duty expressly assumed. This is not an unfair imposition. Franchises are not ordinarily exploited by individuals, but by corporations, whose activities are limited to the one venture for which they are created: their property may well be subjected to this fundamental obligation ahead of all others. The bondholders are in substance co-adventurers and chargeable with the initial conditions imposed upon the enterprise; and the same is true, though in somewhat less measure, of general creditors who deal with the corporation. The only answer made to this is that the covenant of Article IX has become impossible of performance, and unreasonable to en-force. Neither objection is good: the trains can be run, and the duty to run them, as we shall show, entails a duty to keep possession at least of the Manhattan third tracks, and the further duty as a condition of possession, though not strictly as an obligation, to exploit them sufficiently to avoid forfeiture.

The district court, having decided that the Interborough's covenant was only to operate trains over the "Extensions" and the joint tracks, held that it was therefore free to reject the Manhattan lease, since it needed no other franchises to perform its contract than those given by the "Extensions Certificate" and the "Joint Trackage Agreement". With this we do not agree. If we assume that the Interborough had been the direct grantee of the "Third Track Certificate", instead of being only a lessee, it could not have surrendered that franchise and have kept the "Extensions Certificate" and the "Joint Trackage Agreement", unless the three had been separable. If they were not, all must be exploited, or all must be surrendered; and that would have been true, even though they had been only "permissive". Georgia Power Co. v. City of Decatur, 281 U.S. 505, 50 S.Ct. 369, 74 L.Ed. 999; Paige v. Schenectady R. Co., 178 N.Y. 102, 70 N.E. 213; People v. Albany & Vermont R. Co., 24 N.Y. 261, 267, 268, 82 Am.Dec. 295; Pittsburgh & S. C. Co. v. Delaware & N. R. Co., D.C., 289 F. 133; American B. S. Co. v. New York City Railways, supra. In Crawford v. Duluth St. Ry. Co., 7 Cir., 60 F. 2d 212, the question was of certain branch lines—part of the "street railway division"—which ran at such a loss as to absorb any earnings of the remainder of the division. The division as a whole was treated as a single franchise, and, so treated, it could not be continued unless the branch lines were abandoned. In allowing their abandonment the court did no more than hold in the case of a "permissive" franchise that the grantee may throw up part of it, if that is necessary to operate what remains. That depends, as it seems to us, upon whether it can be fairly said that the part retained would have been granted alone. We should hesitate to commit ourselves to the propriety of such a ruling; but in any event the decision has nothing to do with the case at bar. Here the "Extensions Certificate"

and the "Third Track Certificate"—to say nothing of the other two—were certainly intended as a single franchise. In the first place, three of them (all but Contract No. 3) must have been intended. to be single, because separately they would be of no public use whatever; service over the "Extensions Certificate" and the "Joint Trackage Agreement" ends nowhere. All parties have been at pains to emphasize this, though they have drawn different consequences from it. They were meant to insure a through service, which would be frustrated, if any were rejected. For this conclusion we are, moreover, not left to inference. The "Third Track Certificate" expressly declares (Article XV) that if the "Extensions Certificate" shall "not take effect * * * this certificate hereby granted shall become null and void"; and the "Extensions Certificate" (Article XVIII) says exactly the same thing as to the "Third Track Certificate". An argument of almost equal force can be made as to the "Joint Trackage Agreement", save that it lacks the express declarations we have just quoted. Nor does it make any difference in this result that the Manhattan, and not the Interborough, was the grantee of the "Third Track Certificate". The Manhattan lease created a term of 999 years in the elevated roads—to all intents a perpetuity—and the "Third Track Certificate" was leased to the Interborough for 85 years, the full term of the certificate itself, which is beyond the expiration of Contracts Nos. 1, 2 & 3. The Interborough assumed payment of the annual rentals which the City had reserved, and became to all intents the owner of the franchise; every consideration which requires the three franchises to be treated as one, if the Interborough had been grantee, does so with equal force, though it is lessee.

We cannot see that the interpolation of the phrase, "so long as", into Article First of the "Joint Track Agreement" indicates that the "Third Track Certificate" need not be retained in order to hold the "Extensions Certificate". It does of course foreshadow that the roads may be separated, and declares that if they are, the rights in the joint tracks shall end. But that separation might be because one of the roads was recaptured or condemned, or because the Interborough might become

absolutely unable to pay the rentals of the Manhattan. To enlarge these possibilities into an option to reject the lease whenever its retention became destructive of the junior interests, or seriously impairs even the first lien, would be wholly unwarranted. Hence we conclude that the Interborough is bound by Article IX to operate trains over the "Extensions" and the joint tracks, and that in order to do so it must keep those franchises. And we hold that to those franchises the "Third Track Certificate" is indissolubly united, so that it must keep that also.

We have hitherto considered the case as one of a "mandatory" franchise; and this was necessary so long as we did not say that Contract No. 3 was so entwined with the other three franchises that it must be surrendered, if they were surrendered. If that contract was not to be connected, it was necessary to suppose that the three constituted a "mandatory" franchise, because the Interborough was anxious to surrender them, and wished to keep only Contracts Nos. 1, 2 & 3. But if Contract No. 3 is a part of a single franchise with the three, it is not important whether that franchise is "mandatory" or not, for the Interborough cannot surrender one part and keep the rest. We are not entirely clear that, were the case of first impression, we should hold that all four were so intimately bound together as would be necessary to reach this result. But that we need not decide, because the Court of Appeals in New York v. Interborough Rapid Transit Co., 257 N.Y. 20, 177 N.E. 295, has decided it for us. It is true, as the Interborough argues, that the only issue formally decided in that case was whether the Transit Commission had power to raise the five cent fare upon the subway and upon the through service of the elevated. But we cannot treat the conclusion as judicial fiat; the premises implicit in the solution are as authoritative as the solution itself. The first point decided was whether the fare upon the new subway (comprising Contracts, Nos. 1, 2 & 3) was immune from the control of the commission. The court had already held in People ex rel. Garrison v. Nixon, 229 N.Y. 575, 128 N.E. 255, that over contracts fixing fares, entered into before § 49 of the Public Service Commission Law was passed—at least in the amended form of 1911 (Consol.

Laws N.Y. c. 48)—the commission had no jurisdiction: but that it did over all contracts made thereafter, since the municipality was charged with notice of the state's reservation of power. Contracts Nos. 1 & 2, which limited the fare to five cents, had been made before § 49 was passed; Contract No. 3 was made thereafter; if each spoke as of its own date, the fare fixed by Article LXII of Contract No. 3 could be raised, while that fixed by Contracts Nos. 1 & 2 could not. The result would have been that the fare over the new lines, in whole or in part, might be higher than that over the old lines alone. It was not possible to avoid this by treating Contract No. 3 as fused with the first two contracts, since that presupposed that the new contract took over the old, and incorporated their terms. All would then date from 1913. Some words had to be found in Contract No. 3 itself, which not only preserved the existing immunity of the earlier contracts from revision under § 49, but also extended that immunity to Article LXII of Contract No. 3 itself. The court—257 N.Y. at pages 34 and 35, 177 N.E. at page 295— did find such words in the declaration that nothing in Contract No. 3 should "waive" any existing rights. However, this touched only the old contracts; it had to be extended to confer immunity upon the new, if there was to be a uniform fare. That extension was justified because the franchises were so "interlocked", so plainly parts of a single system, as to be in effect only a single congeries of grants, really a single franchise, which could not be dismembered without destroying the scheme. The important thing for the case at bar is that the implied surrender was held to follow from the organic union of all the franchises.

The court next took up the question of the elevated fare. The Manhattan and its predecessors had charged a five cent fare from 1886 forward, but had never promised to limit themselves to it; indeed, so far as concerned local fares, there appears never to have been any limitation whatever. But, as we have seen, in Article VI of the "Extensions Certificate" the Interborough had agreed to charge no more than five cents for a through ride, and the question was whether that was exempt from regulation under § 49, like Article LXII of Contract No. 3. Since it had been executed after § 49 was passed, it was necessary as to it also, to establish a surrender by the Interborough of any recourse to the section. The court proceeded in the same way: it compared the interlocking features of Contract No. 3 (which it had just found to be incorporated with Contracts Nos. 1 & 2) with those of the "Extensions Certificate", and concluded that these two had also been irrevocably combined, so that both subway and elevated were a single system. Once more, the implied covenant to surrender recourse to § 49, was merely a corollary to the indefectible union of franchises. It is apparent that we may not disregard this step in the reasoning on the ground that what was at stake was only a five cent fare. The interdependence of the franchises was the sole justification for the conclusion; it was not a side-remark such as judges may throw out without deliberation. We must hold that, as the "Extensions Certificate" and the "Third Track Certificate" are forever united, so Contract No. 3 is inextricably mingled with them.

■■■ We cannot see that the Interborough's mortgage has any effect upon the result. The argument is that, since it was executed as a part of the transaction of March, 1913, the consent of the Public Service Commission, given under § 8 (10) of the Railroad Law of New York (Consol.Laws N.Y.1909, c. 49), was an approval of all its provisions, and that so far as these conflict with the contracts and franchises, they must prevail. Among the privileges granted to the mortgagee is that of selling in parcels, and it is argued that, should the mortgagee choose to sell the subway system alone, leaving the rump to the Interborough, Contract No. 3 would be separated, and the purchaser would be free to throw off the burden of the Manhattan lease, and the covenants and conditions we have been discussing. How far the mortgagor's covenant in Article IX of the "Extensions Certificate" could be shaken off in that way, we need not inquire; for that is not important, if the bond between the four franchises cannot be broken, because, as we have already said, every part of a franchise must be exploited under pain of forfeiture. We have no doubt that the commission's consent did not make possible a divorce so subversive of the very foundation of the whole

scheme. The clauses in the mortgage are a commonplace of draughting; we do not doubt that they conferred the privileges they professed to confer, so far as these were consistent with the integrity of the mortgaged property; but to read into them the power to dismember the whole transportation system of the City which had been so painfully fabricated, would be a complete perversion. The mortgagee may sell the property in parcels; but it may not use that privilege as an excuse to defeat the conditions whose fulfillment alone made the enjoyment of any part lawful at all.

By 1913 the Manhattan had already built a number of spans of third track which it was authorized to operate under its existing franchises, and which enabled it to give some measure of express service. The "Third Track Certificate" made possible the connection of these spans and the construction of a single through track over substantially the whole system except the Sixth Avenue Line. Strictly, under the reasoning we have adopted, the Interborough is bound to hold only these new connecting spans—if we can imagine their being possessed independently of the third tracks as a whole. However, they cannot be held in mortmain; they are franchises, and, as we have more than once said, they must be exploited, if they are to be retained at all. That condition necessarily involves not only the third tracks, but apparently the local tracks as well, without which it would seem through trains cannot be returned. Nevertheless, although the Interborough may find itself in this way practically obliged to keep substantially the whole Manhattan road, that may prove less onerous than affirming the lease.

In what we have hitherto said we have not included that part of the trackage granted under Contract No. 1 which lay north of the junction of the north end of the "West Farms Extension" with St. Ann's Avenue. Article IX did not cover this; nor did the "Joint Trackage Agreement" give the Interborough, as Manhattan lessee, any privilege of running elevated trains over it. The reason for these omissions is to be found in the existence of two documents, together constituting a single contract, the first executed on July 16, 1903 between the City and the Interborough and McDonald, the original contractor; and the second, on June 7, 1906 between the City and the two roads. The occasion for the first was that, although the projected tunnel under the Harlem River at 149th Street had been delayed, the subway to the east of the river had been completed, and it was possible by building a connecting spur from St. Ann's Avenue across the river to the Third Avenue Road to make some use of the new tracks in conjunction with the elevated. Such a spur the document of 1903 gave the Interborough a franchise to build, made expressly conditional upon the execution of a later implementing contract, to be executed between the City, the Interborough and the Manhattan, in which the Manhattan was to agree to carry free all south-bound passengers from the junction of the spur with itself, and the Interborough was to carry all north-bound passengers from the same point. This contract was to endure as long as Contract No. 1 remained in existence, and was to be a part of it. The spur was built and was used for some time in the intended way, but execution of the implementing contract was delayed for three years, a temporary and informal working agreement being meanwhile used in its stead. The spur was discontinued in July, 1905, when the tunnel was completed; and thereafter in its place transfers were issued. On June 7, 1906, the parties finally executed the implementing contract, but not for the period originally prescribed, for the Manhattan's obligation was to last for only so long as the Interborough "shall continue to operate the railroad of the Manhattan Company." (Strictly the words did not limit the period, but lengthened it —the whole phrase was "during the period of the lease * * * and so long as" etc.—but it seems to be agreed that its true meaning is as we have stated). There being no question that this contract was intended to fulfill the condition of the document of 1903, it created an obligation unless it failed to meet the legal requirements of a contract, or positively ran counter to some rule of law. Several objections are urged against it; the first being that the sureties who had guaranteed the document of 1903 did not join in it. It may be doubtful whether this was necessary, since, as we have said, the document of 1903 became a contract only in 1906; but, because of the change in the duration of the Manhattan's covenant, we will assume that there were no sureties

upon the implementing contract. Nevertheless it has stood for thirty years, and we cannot suppose that the sureties were in ignorance of the deviation; their consent is to be presumed, and in any event it is impossible to see how, after so long an acquiescence, the Interborough can be excused. There was no reason why the Interborough might not agree to carry north-bound passengers longer than the Manhattan carried south-bound, for the City was a party to the change; and a court will not weigh the considerations exchanged. Moreover, here the original connection may have been of great importance to the Interborough. Next it is said that until 1910—§ 27 (3) of the N. Y. Rapid Transit Law, Laws 1909, c. 498— it was not lawful to give trackage rights in the subway, and that this was in substance the effect of the contract. If so, at least after 1910 it was valid, and certainly the parties need not meet again and reëxecute it. Finally it is argued that since the performances were unequal, the Interborough being possibly obliged to carry north-bound passengers after the Manhattan's obligation had ended, the arrangement was unconstitutional, because it "gave" the City's "property" to the Manhattan. However, there was a bargain, no property was "given"; and the fact that it might develop into a one-sided performance was for the public authorities to weigh. They may have believed that the chances that the Interborough would default and lose the lease, were too remote to be considered seriously; for at the time the elevated road was supposed to be a very profitable property. We can therefore see no ground for declaring the contract of 1906 invalid.

It is quite true that after 1913 the "West Farms Extension" was substituted for the spur, and that even this is not now used for more than four hours daily. Verbally the obligation may still be to carry passengers over the spur, because, as we have said, Articles IX and VI of the "Extensions Certificate" do not cover any part of Contracts 1 & 2; but it is apparent that the purpose of the 1913 documents was to substitute the "West Farms Extension", and it would be absurd to read them otherwise. As for transfers, there is no duty to furnish them; their issuance has always been a voluntary substitute, and will remain so. The district

court by a second order included passengers bound beyond the end of the track authorized under Contract No. 1, and included the prolongation authorized by Contract No. 3. This seems to us correct: the words of the contract of 1906 are general, and to interpret them in this way does not contradict them. It would be utterly unreasonable to suppose—particularly in view of the specific reference in Contract No. 3 to the document of 1903 as part of Contract No. 1 (Article II (8) ) —that only those passengers were intended who were bound to and from points on the old track. The parties were making a system of uniform transportation, not a crazy quilt.

In the light of what we have said, the motion to dismiss the appeal needs little consideration. The formal objections— such as the presence of the City and the like—are of no consequence: the only important matter is the sale and destruction of the Sixth Avenue Elevated. It so happens that no part of the third track was upon this division of the Manhattan, and the Interborough has lost none of the rights which, as lessee, it received under the "Third Track Certificate". Therefore its obligations are not affected, nor is its power to perform them. In its negotiations with the Manhattan the destruction of the road may be a factor, but not otherwise. Obviously it does not make the controversy moot.

It is impossible definitively to settle the terms of the order now, but the receiver's instructions should in general be as follows. He must continue to keep possession of all tracks which are authorized under the "Third Track Certificate", and he must exploit them sufficiently to protect the certificate against forfeiture for nonfeasance. He must operate through trains over the "Extensions" and joint tracks, and this will almost certainly make it desirable to continue them over the third tracks as well. (We do not at present decide whether if it is not desirable to do so, he must nevertheless give such through service). He must accept north-bound passengers free upon the "West Farms Extension", whatever their destination (except so far as by agreement transfers are substituted). As possessor of the Manhattan third track on Third Avenue he must similarly accept south-bound passengers free. He will reject the Manhat-

tan lease if he is able to perform the foregoing obligations to the City by any other means than affirmance of it; but if after negotiations with the Manhattan and with the City no other means is possible than affirmance of the lease, he must affirm the lease.

The order is modified in accordance with the foregoing.