**AMERICAN BRAKE SHOE & FOUNDRY CO. et al. v. INTERBOROUGH RAPID TRANSIT CO. et al. (two cases).**

**CENTRAL HANOVER BANK & TRUST CO. v. MANHATTAN RY. CO. et al.**

**MANHEIM et al. v. MERLE–SMITH et al.**

**No. 317.**

Circuit Court of Appeals, Second Circuit.

Aug. 12, 1941.

Simpson, Thacher & Bartlett, of New
York City (Clifford P. Case and Walter

E. Beer, Jr., both of New York City, of counsel), for appellant Manheim.

Milbank, Tweed & Hope, of New York City (Hugh L. M. Cole and Carl V. Venters, both of New York City, of counsel), for appellant Chase Nat. Bank of the City of New York.

Solomon G. Salomon, pro se, appellant.

William C. Chanler, Corp. Counsel, of New York City (William S. Gaud, Jr., of New York City, of counsel), Chester W. Cuthell, Sp. Counsel to Transit Commission, of New York City (Robert W. Maloney, Jr., of New York City, of counsel), Wright, Gordon, Zachry, Parlin & Cahill, of New York City (Boykin C. Wright, Clifton Murphy, and Daniel James, all of New York City, of counsel), for appellees.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

SWAN, Circuit Judge.

Upon a creditor's bill filed August 26, 1932, receivers were appointed for the Interborough Rapid Transit Company and on September 6th the receivership was extended to the Manhattan Railway Company.[1] The properties involved comprised the Subway Division, consisting of City owned lines, mainly underground, operated by Interborough under contracts with the City, and the Manhattan Division, consisting mainly of elevated lines owned by Manhattan and leased to Interborough in 1903 for a term of 999 years from 1875. Under the Manhattan lease Interborough was required to pay taxes, interest on all Manhattan bonds, a small annual sum for maintenance of Manhattan's corporate existence and 7 per cent. dividends per annum on Manhattan's capital stock. A guaranty by Interborough to pay such dividend rental was endorsed on each certificate of Manhattan stock. By a readjustment made in 1922 this guaranty was modified with respect to a great majority of the stock. As the receivership dragged

on it became clear that the solution of many of the problems arising between Interborough and Manhattan and their respective security holders depended on a solution of the question of the right of Interborough's receiver to disaffirm the burdensome Manhattan lease. The question came before this court in Murray v. Roberts, 2 Cir., 103 F.2d 889, and on April 17, 1939, an opinion was handed down holding that because of certain franchise obligations to the City the lease could not be disaffirmed unless, as a result of negotiations with the City, these obligations could be performed by some means other than affirmance. This decision established the City's strategic position in the affairs of the companies and enabled it to prepare to press its unification objective. For many years both before and during the receivership the problem of improving rapid transit within the City by some plan of unification had been under consideration by the Transit Commission, a State agency, and by the City authorities. See N.Y. Law 1921, chap. 134, Public Service Commissions Law. On January 1, 1939, the Fertig Amendment to the State Constitution, art. 8, § 7a, became operative, having as its object the promotion of unification. It authorized the City to issue securities outside of its debt limit for the purpose of acquiring transit securities as well as transit facilities. Fortified by the Fertig Amendment and the decision in Murray v. Roberts, supra, the Transit Commission and the Mayor began negotiations with representatives of various classes of Interborough and Manhattan securities. These negotiations resulted in the summer of 1939 in the proposal by the Transit Commission and the City of a Plan of Unification which was accepted by a great majority of the security holders within the time specified in the Plan. The Transit Commission declared the Plan operative by resolution adopted November 22, 1939. It was consummated on June 12, 1940. By its terms the various classes of security holders of

[1] The complexity of the legal relations between Interborough, Manhattan, their respective security holders and the City has resulted in litigation which has frequently been before this court. See Interborough R. T. Co. v. Gilchrist, 2 Cir., 32 F.2d 1015; American Brake Shoe & Foundry Co. v. Interborough R. T. Co., 2 Cir., 76 F.2d 1002, certiorari denied 295 U.S. 760, 55 S.Ct. 923, 79 L.Ed. 1702; American Brake Shoe & Foundry Co. v. Interborough R. T. Co., 2 Cir., 98 F.2d 72; Manhattan Ry. Co. v. Central Hanover Bank & T. Co., 2 Cir., 99 F.2d 789, certiorari denied Manhattan R. Co. v. Merle-Smith, 306 U.S. 641, 59 S.Ct. 582, 83 L.Ed. 1041; Murray v. Roberts, 2 Cir., 103 F.2d 889; Palmer v. Guaranty Trust Co., 2 Cir., 111 F.2d 115; American Brake Shoe & Foundry Co. v. Interborough R. T. Co., 2 Cir., 112 F.2d 669.

the two companies were offered Corporate Stock[2] or cash (at the City's option) in amounts equal to stated percentages of the unpaid principal amount of their securities. The percentage payments they were offered and the percentage of the holders of each class of the securities who assented by depositing their securities appear in the following table:

| Approximate amount of issue outstanding. | Name of Security | Percentage of principal to be paid. | Nov. 22/39 | Percentage deposited at June 4/40 | May 1/41 |
|---|---|---|---|---|---|
| $97,000,000 | Interb. First 5s | 82½ | 76.66 | 94.76 | 99.62 |
| 28,700,000 | Interb. Sec. Notes | 87½ | 80.65 | 95.29 | 99.68 |
| 40,600,000 | Manh. Cons. 4s | 82½ | 83.27 | 97.56 | 99.81 |
| 4,500,000 | Manh. 2d M. 4s | 50 | 83.27 | 84.98 | 88.42 |
| 43,500 Shs. | Manh. 7% stock | 35 | 27.55 | 82.14 | 96.26 |
| 556,500 Shs. | Manh. Mod. stock | 19 | 63.27 | 93.63 | 99.10 |
| 10,500,000 | Interb. unsec. notes | 35 | 10.74 | 29.19 | 98.79 |
| 350,000 Shs. | Interb. stock | 3 | 9.40 | 17.25 | 96.59 |

The above figures do not include interest adjustments to be made in the case of the first three issues. Also the amounts to be received were to be reduced somewhat by expenses and compensation of committees and certain other charges. Non-assenting security holders were to receive in cash their pro rata shares of the purchase price determined by foreclosure sales and of a settlement fund determined by compromise of numerous conflicting claims of Interborough, Manhattan, the City and various security holders, which were pending in the receivership suit.

In connection with the carrying out of the Plan the district court made various orders which these appeals bring up for review. The matters involved are (a) acquisition by the Merle-Smith Committee for Manhattan Consolidated Mortgage Bonds, through foreclosure and receivership sales, of title to Manhattan properties and the transfer thereof to the City, (b) determination of the amount and the distribution of the Settlement Fund, and (c) adjudication of the Plan as fair, equitable and feasible. There are three appellants: Paul E. Manheim, who represents $484,000 principal amount of Manhattan Second Mortgage bonds, of which he owns personally $31,000; The Chase National Bank, as trustee under said mortgage; and Solomon G. Salomon who apparently owns Manhattan securities consisting of $47,000 Consolidated Mortgage bonds, $11,000 Second Mortgage bonds and 560 shares of Guaranteed 7% stock. The Chase Bank, however, is only a nominal appellant, having taken its appeal at the demand of Manheim and only in order to enable him to obtain consideration by the court of arguments advanced by him against certain orders to which he was not a party. No independent contentions are presented by the Bank and its appeal requires no discussion independent of that devoted to Manheim's appeal, to which we now turn.

The scope of Manheim's appeal is restricted to those provisions of the court's orders which limit him as a non-assenting bondholder to the recovery of $394.68 per thousand dollar bond. He asserts no wish to upset the transfer of the properties to the City or to change the participation of assenting security holders, but he asks for an order directing that the bonds he owns or represents be paid in full, or, in the alternative, that a new hearing be granted to determine what amount in excess of $394.68 he is entitled to receive, or at least that he be given an amount equal to what he would have received had he assented to the Plan. The burden of his argument is that no proceedings were had which validly determined the cash distributive shares to which holders of Manhattan Second Mortgage bonds were legally entitled; that the foreclosure sale and the judicial determination of the settlement fund upon which the respondents rely to support the valuation of $394.68 per bond, were merely devices used to coerce a reluctant minority into acceptance of the Plan; and that in fact his bonds were entitled to be paid in full.

All of the physical properties of Manhattan were subject to the prior lien of the Consolidated Mortgage which was foreclosed in December, 1939, upon a complaint originally filed in March, 1934. The principal of the mortgage debt was approxi-

---

[2] This is a type of bond which the City is authorized to issue. See section 242, subd. c, of The New York City Charter.

mately $40,670,000, interest was in default to the amount of some $2,250,000 and defaulted taxes added nearly $2,000,000 more. The Consolidated Mortgage trustee had some $6,000,000 of cash in hand, but it is apparent that the physical properties would have to be worth more than $39,000,000 to leave any value whatever for the Second Mortgage lien. After lengthy hearings the district court fixed the upset price at $17,-000,000. Little would be gained by reviewing the evidence; it supports the findings, in our opinion. A few observations, however, may pertinently be made. On the basis of earnings the Manhattan properties had nothing to recommend them. The operating results, without payment of taxes, interest or rentals showed mounting deficits: $445,330 for 1938, $1,141,727 for 1939, and an estimated deficit of $1,800,000 for 1940. An expert witness, Mr. Burpee, testified that a fair price for the property would be from $15,000,000 to $20,000,000, although he would not advise any purchaser other than the City to pay that price. Complaint as to the upset price of $17,000,000 is not justified.

By an order dated March 15, 1940, the settlement fund was established at $18,000,000 and apportioned between the four classes of Manhattan security holders: $7,666,666.67 for the Consolidated Mortgage bonds; $1,785,133.73 for the Second Mortgage bonds; $1,202,073.40 for the Guaranteed 7% stock; and $8,-346,126.20 for the Modified Guaranteed 5% stock. The total sum represented a balance in favor of Manhattan and its security holders on conflicting claims between them and Interborough. Against their claims for rentals Interborough claimed the right to set off some $42,000,000 expended in improving Manhattan properties, and a further sum of $7,700,000 based on the "net earnings rule"[3] on the ground that Interborough's receiver had expended that amount in excess of Manhattan's earnings for its benefit. A final determination of these claims and cross-claims would have involved protracted litigation with no assurance of ultimate benefit to Manhattan security holders. The claims were resolved and compromised by way of a class suit under Rule 23 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, instituted by the trustee of the Manhattan Second Mortgage at the direction of a majority of the holders of the bonds thereby secured. Hearings on the questions of law and fact involved were held before Judge Patterson for seven days. Manheim was present and participated. He appealed from the order and contends that because the proceedings were instituted by bondholders who assented to the Plan they were not valid and binding as against him. Further he contends that the compromise did not effect an actual valuation and is within the condemnation of Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982. We do not think these contentions sound. Since Manheim participated in these hearings he cannot complain that a decree was entered against him in absentia at the instigation of a class which did not truly represent him. Cf. Hansberry v. Lee, 311 U.S. 32, 61 S. Ct. 115, 85 L.Ed. 22, 132 A.L.R. 741. As to the fact that the conflicting claims were compromised rather than fought out to the bitter end we believe that a compromise after full hearing on a full record with notice to interested parties is within that class of settlement recognized by Mr. Justice Douglas in Case v. Los Angeles Lumber Products Co., 308 U.S. 106, at page 130, 60 S.Ct. 1, at page 14, 84 L.Ed. 110, where he states: "There frequently will be situations involving conflicting claims to specific assets which may, in the discretion of the court, be more wisely settled by compromise rather than by litigation." We conclude that the compromise was proper and that Manheim was adequately represented in the determination of the amount of the Settlement fund. Consequently the valuation of $18,000,000 representing the claims of Manhattan against Interborough is sustained.

Adding the Settlement fund to the $17,000,000 valuation of the physical properties plus the $6,000,000 of cash in the hands of the trustee for the Consolidated Mortgage gave a total valuation of $41,000,000 for Manhattan assets. The value of Interborough properties was fixed at $56,000,000 making a total of $97,-000,000 as the worth of both. The Plan provided that on conveyance of the properties to the City it would pay over to the contracting committees some $151,000,000 of its Corporate Stock and would recognize certain cash adjustments which bring the total price to about $164,000,000. Man-

---

[3] See Palmer v. Palmer, 2 Cir., 104 F.2d 161, certiorari denied 308 U.S. 591, 60 S.Ct. 121, 84 L.Ed. 494.

heim contends that the difference between what the City was ready to pay and the valuation of assets determined by the foreclosure sales and the Settlement Fund order demonstrate that such valuation cannot stand. It may be conceded that the procedure adopted was intended to make assent to the Plan more attractive than dissent, but it does not follow that the procedure was improperly coercive or that the valuation judicially established cannot stand. The "upset price"—a typical feature of reorganization through an equity receivership—is necessarily in some measure coercive; its function is to assure control of the reorganized enterprise by those who take the new securities. If the sale price were so high as to give non-assenters approximately the same value as what the plan of reorganization offers, the plan itself would be endangered since security holders would have no incentive to take the new securities representing a continuing risk in the reorganized enterprise.[4] Hence, if the upset price represented a fair valuation, as we have shown that it did, and all security holders were given an adequate and equal opportunity to come in, as they were, we do not think a security holder who elected to take cash can complain because the City was ready to pay a higher price to security holders who were willing to exchange their old securities for Corporate Stock. While it is true that in a sense the City was a third party purchaser—a fact which makes this case unique, as it is a fundamental premise of the reorganization process that third parties willing and able to purchase a huge going enterprise at a fair price rarely, if ever, appear (see Louisville Trust Co. v. Louisville, etc., R. Co., 174 U.S. 674, 19 S. Ct. 827, 43 L.Ed. 1130), it is also true that it was not a purchaser for cash. The bulk of the purchase price was to be paid in Corporate Stock. Although the City had the option to pay in cash, this was merely for the City's protection in case its Corporate Stock should be selling at a premium at the date of payment. The recipients of Corporate Stock did not, it is true, get securities representing a risk in the reorganized business only, but they did undertake the risk of the City's credit. As such we think their position analogous to that of assenters in the ordinary receivership reorganization, justifying their participation at a larger percentage of the face amount of their claims than the cash shares of dissenters. Nor do we think First National Bank v. Flershem, 290 U.S. 504, 54 S.Ct. 298, 78 L.Ed. 465, 90 A.L.R. 391, requires a different conclusion. In that case the financial straits of the corporation were not actually serious enough to warrant reorganization, a factor partially explaining the hostile attitude of the Supreme Court towards the proceedings. Further the court expressly indicated that its views were not necessarily applicable to reorganizations of railroads or corporations the continued existence of which was to the public interest. Finally, and most important, the upset price there established was in fact grossly inadequate, below scrap value in fact. See Ballentyne v. Smith, 205 U.S. 285, 27 S.Ct. 527, 51 L.Ed. 803. In the present case, as we have indicated, the upset price was fair.

█ There remains to be considered the matter of the participation of Manhattan shareholders. In the Settlement Fund order they were alloted nearly $10,000,000, while the Second Mortgage bonds were allotted only about $1,800,000 and have not been paid in full. Manheim contends this is invalid under Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110. Had Manhattan assets been used to pay the shareholders instead

---

[4] See Bethlehem Steel Co. v. International C. E. Corp., 2 Cir., 66 F.2d 409; Equitable Trust Co. v. Western Pacific Ry. Co., D.C., 244 F. 485, 504, affirmed 2 Cir., 250 F. 327; Investment Registry, Ltd., v. Chicago & M. E. R. Co., 7 Cir., 212 F. 594, 610; Fearon v. Bankers' Trust Co., 3 Cir., 238 F. 83, 87; Palmer v. Bankers' Trust Co., 8 Cir., 12 F.2d 747; Investment Registry, Ltd., v. Chicago & M. El. R. Co., D.C.E.D.Wis., 213 F. 492, 503; Weiner, Conflicting Functions of the Upset Price, 27 Col.L.R. 132, 139, 143; Swaine, Reorganization of Corporations, 27 Col.L.R. 901, 924; Frank, Reflections on Corporate Reorganizations, 19 Va.L.R. 541, 563; Note, 1 V. of Chi. L.R. 805, 807. With one notable exception, Phipps v. Chicago, Rock Island R. I. & P. R. Co., 8 Cir., 284 F. 945, 28 A.L.R. 1184, certiorari granted 261 U.S. 611, 43 S.Ct. 363, 67 L.Ed. 826, dismissed per stipulation 262 U.S. 762, 43 S. Ct. 701, 67 L.Ed. 1221, the device of the judicial sale at a fair upset price was the standard means of securing majority control in reorganization through equity receivership before the Bankruptcy power in secs. 77, 77B and Chapter X enabled it to be done directly.

of creditors the contention would be sound, but it must be remembered that Interborough's guaranty endorsed on the Manhattan stock certificates gave the stockholders a direct contract claim against Interborough. Peabody v. Interborough R. T. Co., 212 App.Div. 502, 209 N.Y.S. 380; Pennsylvania Steel Co. v. New York City R. Co., 2 Cir., 198 F. 721, 761. As such the compromise establishing their participation in the Settlement Fund was made between them and Interborough and not as participants in Manhattan assets. Consequently the Manhattan stockholders did not receive anything as stockholders, but rather as general creditors of Interborough —a position the same as the Manhattan Second Mortgage bondholders, who themselves were participating only as general creditors of Interborough—all Manhattan physical assets having been exhausted by the Manhattan Consolidated Mortgage prior lien.

Manheim contends, however, that such a view of the position of Manhattan stockholders is wrong, and that the dividend rental is an asset of Manhattan, citing tax cases such as Gold & Stock Telegraph Co. v. Com'r, 2 Cir., 83 F.2d 465, certiorari denied 299 U.S. 564, 57 S.Ct. 26, 81 LEd. 415. Laying aside the questions of the propriety of applying such cases here, because of the particular reluctance of the tax law to give tax effect to a transaction resembling an assignment of income (see Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, 131 A.L.R. 655; Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81), we do not believe that any legal doubts cast on the position of the Manhattan stockholders as creditors can avail Manheim. As the settlement was made by Interborough to dispose of the stockholder claims it is very doubtful whether any infirmity in the stockholders' legal position could benefit the Manhattan Second Mortgage bondholders. More important, however, is the fact that the settlement order, the validity of which we have already sustained, established by compromise the legal rights of the Manhattan stockholders to share as creditors, so that now their status as such cannot be questioned. As participation of Manhattan stockholders was in the capacity of general creditors of Interborough, a status not inferior to the Manhattan Second Mortgage bonds, it cannot be attacked by Manheim as a holder of such bonds.

■ As to the plan adopted for assenting security holders of Interborough and Manhattan providing for their participation in the $164,000,000 offered by the City, it is not altogether clear to what extent the question of its fairness is before the court. The district court properly undertook to examine the Plan and ascertain its fairness. National Surety Co. v. Coriell, 289 U.S. 426, 53 S.Ct. 678, 77 L.Ed. 1300, 88 A.L.R. 1231; Graselli Chemical Co. v. Ætna Explosives Co., 2 Cir., 252 F. 456. Manheim appealed from Judge Patterson's order of March 15, 1940, finding the Plan fair, equitable and feasible, but in his argument he states that his appeal is limited to such provisions of the orders and decrees appealed from as limit his recovery to $394.68 per bond. Objections to the plan by Manhattan Second Mortgage bondholders raise the question of the participation of securities inferior to them. As indicated in the treatment of the participation in the Settlement Fund the treatment of Manhattan stockholders accorded them the capacity of creditors of Interborough, and the same is necessarily true of the Interborough unsecured noteholders.

■ The Plan represents a compromise of the conflicting claims of Manhattan and Interborough devised by the City in its program for unification. While it is true that the exact status of the parties and their rights as against each other have not been reduced to a certainty, we believe that compromise was justified. As to the participation of the Interborough stockholders, who of course are not sharing in the capacity of creditors, we believe with Judge Patterson that on the exceptional facts of this case it is justified. As he pointed out had the issues between Interborough and Manhattan been ultimately resolved in favor of Interborough the share of Manhattan security holders might have been much less and those of Interborough much greater. This meager participation of Interborough stockholders totalling approximately $1,000,000 only represents in itself a settlement of a contingency of far greater value in the stock.

■ Of fundamental importance in this receivership is the part played by the City. Its strategic position throughout is apparent—especially noteworthy being its control of the disaffirmance question and its desire for unification and a prompt settlement of conflicting claims. The

record reveals that the City desired not only to acquire the property but also to satisfy security holders without eliminating any class. To this extent the participation of security holders can be viewed as offers made to them by the City in fulfillment of its program of unification, rather than a participation by them in a lump valuation of the corporation's assets. Even were the validity of the proceedings adopted far more open to doubt than it is we should be most disinclined to upset such a plan as this, where it is obvious that every security holder is faring far better than ever would be the case but for the interest of the City. Had the participation of any class been eliminated or reduced it does not follow that any other class would have benefitted by it; rather it would tend only to reduce the City's price. The City's offer was made to satisfy security holders as well as to secure the properties, and having done so so successfully we will not disturb the Plan on the ground that different offers should have been made.

Consequently we conclude that Manheim and other dissenters were offered a fair plan or an alternative of sharing in a cash fund fairly established. We are not impressed with Manheim's mathematical arguments advanced to show that he should be paid in full, as they all presuppose the invalidity of the foreclosure sale and the Settlement proceedings which we have sustained. A glance at the earning picture of Manhattan together with a consideration of the time and litigation involved, were all the conflicting claims to be fought through, should convince Manheim that he has fared very well indeed. The orders and decrees appealed from limiting his recovery to $394.68 per bond are affirmed.

The contentions of appellant Salomon, a layman arguing his own case in a proceeding which Judge Patterson characterized as the most complex he had ever encountered, are quite difficult to grasp. In so far as they can be understood we agree with respondents that they constitute in substance a reargument of the disaffirmance issue, Salomon claiming, as a holder of Manhattan securities, that the rental obligations of Interborough to Manhattan should have been carried out to the letter. He further appears to contend that the certiorari proceedings in Murray v. Roberts, 2 Cir., 103 F.2d 889, on the disaffirmance question should have been prosecuted fully and that any compromise of the vexatious questions involved was improper. As we have indicated in the treatment of the appeal of Manheim, we conclude that the Settlement Proceedings resolving the conflicting claims of Manhattan and Interborough were properly instituted and concluded and should not be set aside; and certainly we shall not, in any event, decide the merits of such claims as this appellant appears to desire. These issues have wisely been set at rest. Other points that may be involved in the contentions of this appellant, such as the fairness of the Plan itself, have been covered in considering Manheim's appeal.

The orders and decrees appealed from are affirmed without costs.