GUARANTY TRUST CO. OF NEW YORK
et al. v. SEABOARD AIR LINE RY.
CO. et al.

No. 214.

District Court, E. D. Virginia.

April 30, 1945.

W. R. C. Cocke, of Norfolk, Va., and Harold J. Gallagher and Louis F. Carroll, both of New York City, for receivers.

Edwin S. S. Sunderland, of New York City (of Davis, Polk, Wardwell, Sunderland & Kiendl, of New York City), and Leon T. Seawell, of Norfolk, Va., for complainants Guaranty Trust Co. of New York et al.

Carlyle Barton, of Baltimore, Md. (of Niles, Barton, Morrow & Yost, of Baltimore, Md.), and Theodore S. Garnett, of Norfolk, Va., Sols. for Maryland Trust Co., as trustee.

Irwin L. Tappen, of New York City (of Humes, Buck, Smith & Stowell, of New York City), and Baird, White & Lanning,

of Norfolk, Va., for New York Trust Co., as trustee.

Mitchell, Capron, Marsh, Angulo & Cooney, of New York City, for City Bank Farmers Trust Co., as trustee.

Harold C. McCollom, of New York City (of Davies, Auerbach, Cornell & Hardy, of New York City), for Irving Trust Co., as trustee.

Paul R. Kach, of Baltimore, Md., for Mercantile Trust Co. of Baltimore, as trustee of South Bound First Mortgage.

Eben J. D. Cross, of Baltimore, Md. (of Smith & Cross, of Baltimore, Md.), for Mercantile Trust Co. of Baltimore, as trustee of Georgia, Carolina & Northern First Mortgage.

Meredith & Meredith, of Richmond, Va., and E. S. Ruffin & Sons, of Norfolk, Va., for Mercantile Trust Co. of Baltimore, as trustee of Seaboard & Roanoke First Mortgage.

James Piper, of Baltimore, Md. (of Piper, Watkins & Avirett, of Baltimore, Md.), for Baltimore National Bank, as trustee of Georgia & Alabama First Mortgage.

Leonard D. Adkins and James B. McDonough, Jr., both of New York City, for Reorganization Committee.

Venable, Baetjer & Howard, of Baltimore, Md., for Underlying Bondholders Committee.

DeLano Andrews, of New York City (of Sullivan & Cromwell, of New York City), for First and Consolidated Bondholders Committee.

Arthur B. Brenner, of New York City (of Van Vorst, Siegel & Smith, of New York City), for Refunding Mortgage Bondholders Committee.

Lewis C. Williams, of Richmond, Va. (of Williams, Mullen & Hazelgrove, of Richmond, Va.), for group of holders of Seaboard Air Line Ry., Atlanta-Birmingham First Mortgage 4% Bonds.

Abraham Mitnovetz, of New York City, and Harry O. Levin, of Baltimore, Md., for Protective Committee for Georgia & Alabama Railway First Mortgage Consolidated Five Per Cent. Gold Bonds.

Frank P. Fleming, of Jacksonville, Fla., for receivers.

McCarthy, Bond & Lane, of Jacksonville, Fla., for Maryland Trust Co., as trustee.

George W. Milam, of Jacksonville, Fla., for Baltimore National Bank, as trustee.

Jennings & Watts, of Jacksonville, Fla., for Mercantile Trust Co., of Baltimore, as trustee.

CHESNUT, District Judge.

This opinion is filed to state the considerations which have influenced certain provisions of the court's decree dated April 12, 1945, for the foreclosure and sale of certain mortgaged properties of the Seaboard Air Line Railway; and particularly those determining the "upset prices" for the properties to be sold as an entirety, or for the several units thereof if sold separately.

The decree is a very elaborate and extended legal document comprising 411 pages of closely printed matter, including the appendices. It includes recitals of (1) the jurisdictional facts and citizenship of the parties; (2) the former proceedings in creditors' and foreclosure causes; (3) the formal facts of the execution of the several mortgages, supplemental indentures and releases; (4) the property involved subject to the liens; (5) the issue of mortgage bonds; (6) the defaults under the mortgages; (7) the amounts due on the mortgage bonds and (8) the inability of the Railway Company to pay the indebtedness. The decree then directs that the payments which are due shall be made or in default thereof the properties shall be sold, subject to certain specified liabilities and particular liens. A special master is appointed to make the sale on May 31, 1945, at Portsmouth, Virginia, the one sale to include railroad properties lying in the Fourth and Fifth Judicial Circuits, after the required notice of sale substantially in the form set out in Appendix D to the decree. The decree then specifically describes the properties to be sold and directs that they shall be offered for sale in 13 separate units, the latter provision having regard to the properties covered by the several respective mortgages to be foreclosed. The special master is directed to receive and tabulate the respective bids for the several units separately and for the entire property, to accept the highest bid or bids, and to report the same to the court within ten days thereafter; and within twenty days after the filing of his report, it, without further notice, shall come on for hearing before the courts, at which

time the sales to the highest bidder as reported by the special master may be confirmed by the court. The decree states that, except in the event of necessary adjournment of the sale, the master's report shall be made on or before June 9, 1945, and the court hearing thereon to be held on June 29, 1945.

The decree also contains the usual provision for conveyance of the property to the purchaser by the special master upon payment or satisfaction of the purchase price, with particular provision for the accounting between the receivership estate and the purchaser of the property. With respect to this accounting, the decree specially provides that the operation of the Railway properties shall be continued by the Receivers until the actual transfer of the property to the purchaser, and the net revenues, as particularly specified in the accounting to be made, shall belong to the receivership estate. Certain miscellaneous and incidental matters of accounting, determination and allowance of costs and expenses, and settlement of accounts of the Receivers are reserved by the decree for future determination.

The Seaboard Air Line Railway System as it now exists is the result of a long historical development in the process of which numerous smaller roads have from time to time been acquired by purchase, consolidation or leases, and have been integrated into one whole railroad system including about 4,000 miles of track. This piecemeal integration has resulted in a very complex legal situation in which there are now three general mortgages, ten underlying mortgages, and several long leases or the holding of controlling stock interests in separate lines. The bonds outstanding under some additional underlying mortgages are largely pledged under the general mortgages. Some of the bonds secured by the first general mortgage are pledged under the second, and some of the second general mortgage bonds are pledged under the third general mortgage. The reorganized system as now proposed will ultimately have a much simpler legal structure in that the whole property will be subject to two new mortgages, one a first mortgage covering a fixed rate at 4%, and a second income mortgage. In the process of simplifying the legal structure it has been found advisable in the decree to provide for the foreclosure of the three general mortgages and six of the underlying mortgages by offering the properties

thereunder for sale in separate units, and then offering the properties for sale as an entirety. The reason for not now foreclosing some of the underlying mortgages is that the outstanding bonds thereunder are well secured and must be ultimately paid off in full. Some of the general mortgages also cover the properties as a second lien and in some cases underlying bonds are pledged under one or more general mortgages. Outstanding publicly held bonds secured by mortgages on the Carolina Central and the Florida Central and Peninsular Divisions in the principal amount of $7,372,000 are to be assumed by the purchaser if the property is sold as an entirety. The total amount of principal and accrued interest as of May 31, 1945, the proposed date of sale, on all bond issues to be assumed by the purchaser is $9,494,710.

The six underlying mortgages which are to be now foreclosed are (1) the Seaboard & Roanoke Division; (2) the Georgia, Carolina and Northern Division; (3) South Bound Division; (4) Georgia & Alabama Division; (5) Atlanta & Birmingham Division and (6) Florida West Shore Division. The first four of these Divisions are also subject to the second lien of the Seaboard first mortgage. The fifth and sixth are also subject to the second lien of the Seaboard Refunding Mortgage. The reason for offering the properties of these six Divisions for sale in separate units is that, if the whole railroad system is sold as an entirety, the portion of the purchase price applicable to the separate Divisions may be determined by the percentage relation of the highest bids for the several Divisions to the purchase price for the property as an entirety. This is provided for in section 16.4 of the decree.

An important feature of the decree is the determination of the "upset prices" for the sale of the property as an entirety and for the separate units offered for sale. These are specifically stated in section 17.9 (p. 172) of the decree. As previously indicated, this opinion is largely for the purpose of stating the basis for the determination of these "upset prices".

The equity receivership of the Seaboard Air Line Railway originated in 1930 in the Eastern District of Virginia in the Fourth Judicial Circuit, as the court of primary jurisdiction, with ancillary proceedings in the Southern District of Florida in the Fifth Judicial Circuit. In December 1943 the Virginia and Florida Courts respec-

tively, as a result of a hearing before the judges of said Courts jointly sitting, confirmed (with modifications) a plan for the reorganization of the Railway Company. Guaranty Trust Co. of New York v. Seaboard Air Line R. Co., D.C., 53 F.Supp. 672. On appeal to the Fourth Circuit Court of Appeals by certain minority bondholders who were dissatisfied with the amounts of the new securities allotted to them in the reorganization plan, the order of court approving the plan of reorganization with modifications, was affirmed in an opinion by Circuit Judge Soper, Badenhausen v. Guaranty Trust Co., 145 F.2d 40. Certiorari was denied by the Supreme Court, 323 U.S. 797, 65 S.Ct. 440. See also Badenhausen v. Baetjer, 146 F.2d 762. Certiorari denied 65 S.Ct. 1029. A separate appeal by some of the same parties taken in the Fifth Circuit has also resulted in an affirmance of the order. Badenhausen v. Glazebrook, 148 F.2d 450.

On April 10, 1945, the Judges of the Virginia and Florida courts held, after due notice to all parties in interest, another joint hearing for the purpose of considering the provisions of the then proposed decree for foreclosure and sale. As provided in the notice for the hearing, printed copies of the proposed decree as submitted by counsel for the Trustees of various mortgage bond issues with the approval of the Reorganization Committee, had been circulated among the parties in interest. The hearing was largely attended by counsel or representatives of most if not all of the Trustees of the several mortgages and by other parties in interest, including those who had taken appeals from the orders approving the reorganization plan. Uncontradicted evidence was submitted to support various recitals of fact in the decree. The principal, if not the only, issue in controversy at the hearing related to the determination of the "upset prices". These "upset prices" had not been specified in the proposed decree. An opportunity was given to all parties in interest to submit evidence for the determination of these prices; and the court heard argument upon the subject from various interested parties.

Evidence was submitted on behalf of the Mortgage Trustees relevant to the subject. The basis advanced for determining the "upset prices" for the respective units of property to be sold was to first determine the proper "upset price" for the whole property of the Railway as an entirety, and deduct therefrom the amount of the liens subject to which the property is to be sold. Upon determination of this "upset price" for the property to be sold as an entirety, it is then necessary to determine the separate prices for the several units, to be offered for sale, alternatively to the offer of the property as an entirety. It was proposed to apportion the "upset price" for the whole property to be sold among the several units separately offered for sale on the basis of the relative values of the component parts of the Seaboard System, (as heretofore determined in the plan of reorganization) evidenced by the allocation of the new securities, the latter for the computation to be valued at their respective market prices (if, when and as issued) on March 15, 1945.[1] There was

---

[1] The detailed calculation appears on Exhibit 18. Because some of the underlying bonds are pledged under some of the general mortgages, and some of the general mortgage bonds are pledged under other general mortgages, a somewhat complex adjustment is necessary to ascertain the true proportion for the upset prices for those units to be separately offered for sale covered by the general mortgages. The figures for the several units are shown in column 12 of statement No. 2 of this Exhibit, prepared, however, on the basis of an upset price of $50,000,000 for the whole property to be sold. But as will hereafter appear, the court has fixed the upset price at $52,000,000. This necessarily results in somewhat larger figures for the several upset prices for the several units to be found on page 172 of the decree.

Still another adjustment is necessary with respect to the upset prices for the units to be sold involving properties subject to certain underlying mortgages. For instance, in statement No. 2 on this Exhibit, column 12, the upset price for the Georgia & Alabama Division is stated to be $1,719,397. This figure is properly increased in the decree for the reason just above explained, to $1,777,197. In column 8 of statement No. 1 of Exhibit 18, the market value of the new securities allotted to the Georgia & Alabama Division is shown to represent 2.89% of the market value of the whole of the new securities, as allotted in the plan of reorganization. It will be noted, however, that the figure of $1,777,197 is more than 2.89% of $52,000,000. The reason that the larger figure is proper results from the fact that the percentage of 2.89 is calculated on a base

no substantial objection from any party in interest to this proposed method of determining the upset prices for the separate units. The only controversial issue was what would be a reasonable and proper upset price for the whole properties to be sold.

The affirmative new evidence bearing on this issue consisted principally of the expert opinion evidence of the witnesses Kennedy and McGinnis. Kennedy is the railway valuation expert who had· previously testified in various former proceedings in the reorganization case, first before the special master who formulated the original plan, then before the Court on exceptions to ·the plan, and later before the Interstate Commerce Commission in proceedings there pending in 1944 which resulted in the substantial approval of the proposed new capitalization. Kennedy's opinion of the fair upset price for the whole property *free of liens* was $62,000,000. He based this opinion on the view that the prior history of the Railway from 1926 to date, and present conditions and future prospects, justified the conclusion that the net earnings of the Railway System as a whole applicable to the payment of charges on capital, in normal times, would be approximately $6,200,000; and that considering the relevant data affecting the Seaboard Railway System, the reasonable price for a purchaser of the Railway free from liens would be a sum equal to ten times the amount of the net earnings, that is, a capitalization at the rate of 10%. In this re-spect the opinion of the witness proceeded along the same lines on which he had based a similar view in his testimony before the Interstate Commerce Commission in support of the proposed new capitalization.

Under the provisions of the decree the purchaser is to assume and satisfy the liens of outstanding equipment trust obligations, and of the amounts due under the underlying mortgages on some of the separate Divisions (the larger amounts being the outstanding bonds of Carolina Central and the Florida, Central and Peninsular Divisions) aggregating about $18,700,000.

Kennedy's opinion was, therefore, that the upset price for the property to be sold (subject to liens of about $18,700,000) was $43,300,000.

Kennedy's opinion was further supported by the opinion of a financial expert, McGinnis, who had had extensive acquaintance with market prices in the valuation of railway properties and particularly those affected by reorganization. He submitted a tabulation (Ex.19) showing the range of market prices for Seaboard securities of the Divisions to be sold under the decree for the years 1940 to 1944, and including the first two months of 1945. This statistical compilation showed that the aggregate market price of the presently outstanding bonds secured by mortgages to be foreclosed ranged from a low of about $6,000,000 in 1940, to a high in 1945 of about $90,000,000. The aggregate average market price for the whole period for all these outstanding securities was about $38,000,000. The tabulation, however, shows a rather uniform steadily increasing aggregate valuation during the whole period with the high level being at current market prices. It may be noted that the market price of the Seaboard securities has steadily and sharply advanced as the plan of reorganization has progressed toward successful consummation. But of course it is also important to bear in mind that the market prices have doubtless been substantially affected by the comparative prosperity of the railroads generally in these recent years of war. It was also the expressed opinion of Mr. McGinnis that a further market rise of about 10% could reasonably be expected in the market price of Seaboard securities upon the final successful reorganization of the Railroad. But in this connection it must be borne in mind that the cessation of war will naturally materially affect railroad earnings.

On this evidence counsel for the Reorganization Managers contend a fair upset price for the properties now to be sold under the decree should be about $44,000,000—$62,000,000 less $18,000,000. Counsel for the minority bondholders of the Georgia & Alabama Division (who ap-

---

which includes the market value of the securities which are to be assumed by ·the purchaser. The amount of these assumed liens, principal and interest, to May 31, 1945, to date of sale, is $9,494,710. This amount must, therefore, be added to the upset price of $52,000,000 (for the property to be sold subject to these liens) to

obtain the proper proportion of the true upset price for the Georgia & Alabama Division. That is to say, for the purposes of this particular calculation the upset price to be apportioned is $52,000,000, plus $9,494,710, that is, $61,494,710.

pealed from the approval of the reorganization plan) contend that the upset price for the whole property free of liens should be not less than the par value of the aggregate of the new capitalization, $196,-870,000. This new authorized capitalization, which has been approved by the Interstate Commerce Commission, includes (in addition to about $11,000,000 of receivers' equipment trust obligations), $32,500,-000 new 1st mtge. 4% bonds; $52,500,000 of new income mortgage 4½% bonds; $15,000,000 of 5% preferred stock and $85,-000,000 assumed par value of new common stock. The market price for the aggregate of the new securities traded in on the basis of when, as and if issued, is, including the so-called "arbitrage" about $107,000,000 at present quoted prices. There would seem to be no reasonable support for the view that the upset price should be fixed on the basis suggested by counsel for the Georgia & Alabama minority bondholders. His view found no support from any other party in interest represented at the hearing. It has never been thought that the securities to be issued under the reorganization plan would have a market value, except for first mortgage bonds, of anything like par value. In the opinion of this court confirming the plan with modifications, it was said (53 F.Supp. 681):

"It is highly improbable that any of the new securities, with the possible exception of the first mortgage bonds, will have a realizable market value of par. The very reasonable estimate is that the new first mortgage bonds will have a market value of a little less than par; the income mortgage bonds 50, the preferred stock 25 or 30, and the common stock about 10 or 15 per share. Of course these are only estimates as it is impossible to predict with even approximate certainty future market conditions."

Since then the reorganization has progressed successfully so far in that the plan has been approved on appeal by the Appellate Courts of both Circuits, and the high level of railroad earnings has continued for another year with prospects of very satisfactory net earnings for the current year although in reduced amount. These favorable features have had their effect on the market price with the result that the market prices as of March 15, 1945, for the several issues of the new securities are 101 for the first mortgage bonds; 80 for the income mortgage bonds; 66 for the preferred stock and 27 for the common stock. It is, of course, impossible to predict the continuation of these high market prices which will probably be materially affected by post-war conditions. Some other interests, however, did for various reasons contend that the upset prices should be somewhat larger than those contended for by counsel for the Reorganization Committee.

This court has heretofore given some consideration to the principles properly applicable to the determination of an upset price in an equity railroad reorganization, 53 F.Supp. 700, where it was said:

"Another important objection that has heretofore sometimes existed in equity corporate reorganizations, is the lack of adequate consideration for non-assenting creditors. In some of the earlier cases the reorganization plan was formulated by the active dominant interests without due regard to the minority dissenting creditors, whose only protection came in the amount of cash allowed them as a result of the 'upset price' fixed by the court for the mortgage foreclosure sales. And in practice it is said that in many such cases the upset price was itself the result of a consent order by the courts without adequate consideration of the interests of dissenting creditors. But that real inequity in some of the earlier cases does not apply here, where the upset price to be fixed will properly reflect the fair and equitable features of a plan which has been evolved only after long and careful consideration by the special master and further consideration by the court after extended hearings. * * * Apart from title questions the chief function of the mortgage foreclosure sale is to determine the cash sum which non-assenting creditors are to receive. Theoretically the dissatisfied bondholders could bid up the sale price; but practically the sale price is determined by the upset price because in the nature of a railway organization, under present federal law, there can effectively be only one purchaser for the property, as authorized by the Interstate Commerce Commission."

The particular subject of upset prices in railroad mortgage foreclosures has recently been discussed in legal literature. See Gerdes "Corporate Reorganizations", Vol. 1, §§ 14–20; and Vol. II, §§ 1050–1066; Swaine "A Decade of Railroad Reorganizations Under Section 77 of the Federal Bankruptcy Act", 11 U.S.C.A. § 205, Harvard Law Rev. June and July 1943; Some Realistic Reflections on Some Aspects of

Corporate Reorganizations by Jerome Frank (now Circuit Judge) 19 Va.Law Rev. 541, 598; Weiner, Conflicting Functions of the Upset Price in a Corporate Reorganization, 27 Columbia Law Rev. 132; Finletter, Corporate Reorganizations, 526, and cases cited in note, page 529.

▮▮ It is not possible to deduce from the judicial decisions or the commentators thereon any formula for the determination of upset prices of general application in corporate reorganizations. The most that can be said is that it is a matter of sound judicial discretion in each case. But I think the principle to be applied in this case is quite clear. The upset price to be fixed must afford fair treatment to non-assenting bondholders having due regard to the probable fair value of the property reasonably ascertained.[2] On the other hand, the upset price should not be fixed at a figure so high that it will seriously impair the success of the reorganization which has been determined in this case to be not only necessary in the public interest but will be under a plan which has been found to be fair and equitable and which now is desired by such a very large proportion of all the affected bondholders. As was said by Judge Soper in concluding his opinion in the Fourth Circuit Case (145 F.2d 57), referring to the contentions of the appellant minorities:

"but they should no longer be permitted to impede a reorganization so long and carefully studied in the District Court and so earnestly pressed by the overwhelming majority of secured creditors who desire to avail themselves of the present period of railroad prosperity."

▮▮ The function of an upset price in a decree for judicial sale, is, of course, merely a direction to the officer making the sale not to accept any bid for the property below the upset price. It is intended as a minimum price and not in itself an exact measure of fair value. The ordinary judicial sale of course contemplates the acceptance of the highest bid at an auction sale where it is anticipated there may be several competitive bidders. But in sales of railroads under existing federal law affecting interstate commerce, it is seldom that there will be more than one bidder qualified to purchase the property, because the purchaser of the railroad must first obtain the approval of the Interstate Commerce Commission in the public interest. And in the very nature of the case it is highly improbable that there will be any bidder for a vast railroad system such as the Seaboard Railway other than the Reorganization Committee in this case. First Nat. Bank v. Flershem, 290 U.S. 504, 526, 54 S.Ct. 298, 78 L.Ed. 465, 90 A.L.R. 391.

▮ This Committee has been very successful in securing assents to the Reorganization Plan by the bondholders. About 85% of all the Seaboard bondholders entitled to participate in the plan have already assented, and it seems highly probable that 90% or more will ultimately assent to the plan and voluntarily accept the new securities allocated to them respectively. Not only have 85% of all the securities of all issues assented to the plan, but more than 80% of bondholders under each mortgage foreclosed have so assented with the exception of the Seaboard Refunding 4's, where the present percentage of assents is 79.38. In some issues substantially more than 90% of the bondholders have assented. In the Georgia & Alabama Division more than 85% have affirmatively assented. This very high percentage of assenting bondholders is from a practical standpoint very substantial evidence of the fairness of the plan in the opinion of the bondholders. Especially is this true when it is remembered that the Railway has been in receivership for nearly fifteen years, with almost continuous default in payment of interest on the bonds of the numerous Divisions; and with a naturally consequent difficulty on the part of the Reorganization Managers in locating the holders of outstanding bonds; and in view of the generally known fact or belief that a substantial part of the bonds had been held in European countries directly affected by the existing war. Indeed the only known dissatisfaction with the reorganization plan exists on the part of those interests which heretofore have prosecuted appeals in the case, and these affirmatively dissenting bondholders represent an aggregate amount of only about $1,000,000 out of a total of

---

[2] In determining value in such a case importance has often been given to earning capacity of the property and to market prices of the securities of the particular corporation, where there is a free and active market for them. Weiner, 27 Columbia Law Rev. 132, 142; Palmer v. Bankers Trust Co., 8 Cir., 12 F.2d 747, 754; American Brake Shoe & Foundry Co. v. Interborough Rapid Transit Co., 2 Cir., 122 F.2d 454.

more than $150,000,000 of principal of outstanding bonds or secured obligations; that is, less than 1%.

In corporate reorganization in equity, dissenting bondholders and other creditors who are entitled to participate in the benefits of the reorganization may not be bound and controlled by even a large majority of assenting creditors. To meet this situation it was provided in section 77 of the Bankruptcy Act affecting railroad reorganizations, and in Chapter 10 of the amended Bankruptcy Act, 11 U.S.C. A. § 501 et seq. (superseding former section 77B, 11 U.S.C.A. § 207) relating to ordinary corporations, that a two-thirds majority of creditors may ordinarily control the whole plan of reorganization provided it is found fair and equitable by the court. In these statutory reorganizations the formal procedure of a sale has been dispensed with and therefore no upset price is ordinarily required to be determined by the court in the interests of non-assenting creditors. But in equity the sale is still regarded as a necessary procedural step in the reorganization to bind the interests of the non-assenters to the plan; and the fixing of a fair upset price is therefore the only definite legal assurance on which the non-assenters can rely. Where the reorganization affects a railroad, by reason of the practical limitation of bidders at the sale, the determination of what will be a fair upset price assumes added significance from the standpoint of the fair treatment of non-assenters.

In determining the particular amounts for the upset prices in the instant case, we have considered all the relevant data which was before us at the hearings on the reorganization plan and that subsequently adduced at the hearing on the provisions of the decree. The opinions of the experts, Kennedy and McGinnis, are supported by plausible reasons but we have not limited our consideration of the case to those opinions alone. There are other facts in evidence arising from the more recent experience of the Railway and its present and future prospects which are entitled to consideration, and which we think tend to support somewhat higher upset prices, although it is manifestly difficult to appraise them with anything like mathematical certainty.

In favor of somewhat higher upset prices we have the evidence of steadily increasing market prices for the new securities, and even more importantly, a continuation of comparatively large net earnings for the last two years. We also have the fact that during the receivership the physical condition of the railroad and its equipment has been greatly improved through efficient management by the Receivers and the expenditure of many millions of dollars in betterments. The beneficial effect of this on future operations ought to result in a decreasing operating ratio of expenses to receipts. In addition, the receivership has a presently favorable cash position, estimated as of May 31, 1945, in that after making adequate provision for all accruing obligations and authorized betterments, the Receivers have in hand reserve funds amounting to about $25,000,-000, which includes $10,000,000 possibly required for various reorganization expenditures, and $13,000,000 for future betterments or as working capital. (Ex.16) In 1942 the Railway's total gross income (applicable to charges) was $34,566,102; in 1943 the total gross income was $29,209,-597 and in 1944 the same figure was $22,-892,481. The gross income for the first two months of 1945 indicates a comparative figure for gross income for the year 1945 of about $20,000,000. (Ex.12) The present market prices for the aggregate of all the new securities when issued approximates $107,000,000.

But these factors must be considerably discounted by other considerations. No one reasonably expects the present high operating revenues or net earnings to be long maintained after the war. Indeed both the gross and net operating revenues are now showing a decline. The net for 1942 was over $34,000,000, but for 1944 was less than $23,000,000. Operating expenses increased more than $10,000,000 in 1944 over 1943, largely caused by increased wages and taxes. After the war it is reasonable to anticipate increased competition with other forms of travel and transportation by water and air. Nor would it be reasonable or safe to base the fair commercial value of a railroad system as an entirety on the present comparatively high level of market values of such of the securities as are bought and sold in the financial markets. The statistical tabulation above referred to (Ex.19) shows a wide fluctuation in market values during the last five years and it certainly would not be conservative to forecast the present high level for the indefinite future. There is much less risk to an investor in buying se-

616

curities at a cost of a few thousand or even a few hundred thousand dollars than in purchasing a railroad system at a cost of upwards of $100,000,000. Under present statutory railway regulation the operation of a railroad devoted to public service, even when operated at a large deficit, may not be abandoned without the approval of the Interstate Commerce Commission.

There is another important factor in determining the fair upset prices in this case. The principal function of the prices when so determined is a guarantee of at least a minimum cash sum to the non-assenting bondholders. It is true that this minimum to the non-assenting holders tends also to be a maximum for the purchase price by the Reorganization Committee representing the large majority of assenting bondholders. Or, in other words, the upset price is likely to be the actual price bid at the sale. It should not be too low to be fair to the non-assenters, but also it should not be too high for fairness to the purchaser who must provide the cash for payment to non-assenters. In the latter event there would probably be no purchaser and no sale unless and until a lower upset price is fixed. This situation has in fact heretofore developed in some cases in the past. And it must also be borne in mind that the upset prices now to be fixed will after the sale and until final transfer of the properties to the purchaser, continue to be his obligation fixed in amount. It is possible, although it is hoped that it will not actually be the case, that the final settlement may be delayed by further litigation. If so, the purchaser has a fixed and inescapable obligation. On the other hand, the non-assenters to the plan have a double option. They can take the portion of cash distributable to them respectively or they can, within the reasonable limits and on the conditions to be hereafter fixed by the court, assent to the plan and receive the new securities. If the market price for the new securities continues to be in excess of the distributable cash, the non-assenters can obtain the benefit of the higher market prices by exchanging their old securities for the new. If, on the other hand, the market price should sharply recede to an amount less than the distributable cash, the non-assenters have the right to this larger cash distribution. See American Brake Shoe & Foundry Co. v. Interborough Rapid Transit Co., 2 Cir., 122 F.2d 454, 459.

After weighing these somewhat opposing considerations and all other relevant data that we have before us, we conclude that a just determination of the figure for the upset price for the property to be sold subject to liens, warrants an amount somewhat in excess of the sum advanced in the opinions of the experts. The nature of the case as a whole impresses upon us the view that in fixing the upset prices the court should be as liberal as the circumstances warrant in favor of the probably widely scattered and generally unorganized nonassenters who, for the most part, by reason of conditions over which they may have had no control or even as a result of their own neglect, have not been actively represented in this case.

Translating these general principles for judgment into concrete figures, we conclude that the fair upset figure for the Railway System considered as an entirety, and free from liens to be assumed by the purchaser, is $70,000,000. This figure, however, is necessarily to be reduced in the computation of the upset prices for the separate units in which the property is to be sold, by the deduction therefrom of the amount of the liens to be assumed by the purchaser which, as previously indicated, is about $18,000,000. We have thus determined the upset price for the property subject to the liens at $52,000,000.

In reaching this conclusion we have also borne in mind the provision of the decree which gives to the receivership estate, and not to the purchaser, the net revenues from the operation of the property as provided for in the accounting to be made between the receivers and the purchaser, which amount it is estimated may be several million dollars.

The upset price of $52,000,000 for the property to be sold subject to the liens to be assumed by the purchaser is approximately equivalent to two-thirds of the present highest market value of the *old* securities, now somewhat less than $100,-000,000 (see Ex.19, and adding thereto about $9,000,000 of securities not involved in the sale), because, for the purposes of the comparison there must be added to the $52,000,000 the sum of $9,474,710, which is the amount of the principal and interest of the mortgage liens to be assumed by the purchaser, as of May 31, 1945, the date of sale. In the calculation there should also be added the estimated amount of net rev-

enues just referred to so that for the comparison the total effective upset price will be about $65,000,000. We consider this not unfair to the non-assenting bondholders because they will still have the option, by assenting to the plan, to exchange their old for new securities and thus realize therefrom the higher market prices if they still prevail. On the other hand, we consider the upset price also not unfair to the assenting bondholders represented by the Reorganization Committee, as the prospective purchaser, because the margin between the present indicated market value of the new securities and the upset prices is sufficiently large to absorb without prejudice to the purchaser any decline in the market price between the present levels and those which are likely to prevail within the next few months.

■ The upset prices fixed for the several units in which the property is to be offered for sale, alternatively to the sale of the property as an entirety, is also fair to the non-assenting holders of bonds secured by mortgages on the several properties. For instance, the upset price for the Georgia & Alabama Division, which is Unit No. 4, is $1,777,197 (p. 172 of the decree). In comparison with this figure it will be found from Exhibit 19 that the market price for the old securities of the Georgia & Alabama, has varied from a low of $494,800 in 1940, to a high in 1945 of $2,783,250. But even so late as 1944 the low market price for these old securities was only $1,391,625. The average market price for the last five years is $1,465,072. It is apparent that the market price for the present outstanding bonds of the Georgia & Alabama Division, in common with other Seaboard securities, has greatly increased as the plan of reorganization has progressed toward successful completion. The present market price is now more than five times the low market price of 1940 and more than three times the high market price for that year. In 1943, before the approval of the plan by the court, the low market price of Georgia & Alabama bonds was $1,175,150. In 1944, after the approval of the plan (with modifications) the high market price rose to $2,489,463. More than 85% of all this bond issue has now assented to the plan. The small minority will have the option to either accept the new securities allotted under the plan and obtain the higher market prices therefor if they still prevail, or to accept a cash distribution which will be substantially more than the average market price for their bonds which has prevailed during the last five years.

■ One further provision of the decree with respect to upset prices needs explanation. The decree provides (p.172) that the upset price for Unit No. 6 shall be $196,000. The property included in this Unit is described (decree page 126) as parcel 1 of lot 11. It consists of 34.13 acres of land, with some railroad trackage, a freight station, two warehouses and other minor improvements thereon situated in Savannah, Georgia, and elsewhere referred to as the Savannah Lots. There is dispute as to whether the substantial beneficial value of this property is covered by the South Bound mortgage or by the Florida, Central and Peninsular mortgage. The special master's report on the plan of reorganization treated the property as fairly belonging to the Florida, Central & Peninsular Division. Mortgages on both Divisions are principally represented in the case by the Underlying Bondholders Committee. More than 85% of the South Bound bondholders have assented to the plan of reorganization. One of the appellants on the appeal to the Fourth Circuit owned or represented a small minority of bonds which had not assented to the plan. One of his contentions on the appeal was that the special master was mistaken in not valuing these Savannah Lots and improvements thereon as property included in the South Bound Division mortgage, and that the property was worth $1,000,000. This contention was not made to or considered by this court during the hearing on exceptions to the plan. As to this contention on appeal, the opinion of the Court of Appeals (145 F.2d 57) said:

"There was put in evidence a deed of May 14, 1890 from the City of Savannah to the South Bound Railroad Company which purports to cover land underlying this portion of the Seaboard system on condition that the construction of the road to the city be finished in two years from March 1890; but so far as we are able to determine, there is no evidence that the portion of the line constructed thereon became the property of the South Bound Railroad Company or was made subject to its mortgage. It seems that the railroad facilities now on the property were constructed by the Florida Central and Peninsular Railroad as lessee and have always

been treated as subject to the mortgage of that road. Moreover, there is no evidence, as far as we can find, to sustain the contention that this portion of the line had a value of one million dollars, or that the allocation of the South Bound would have been materially increased if the property had been treated as subject to the lien of its mortgage. The appellant has failed to make proof of the facts upon which the contention is based."

At the recent hearing in this court uncontradicted evidence was offered to show that the value of this property including improvements thereon, is $196,000. But no evidence was offered by any of the parties in interest sufficient to now determine the disputed question of ownership. It has, therefore, been thought advisable to make provision in the decree for the separate offering for sale of this particular item of property at an upset price of $196,000, which represents its full fair value, leaving open for subsequent determination the distribution of the proceeds upon future determination of ownership. Provision is also made in the decree (s. 16.4, page 167) for the proper allocation of the value of this Unit, in the event that at the sale the particular Unit is not sold separately but is included in the sale of the property as an entirety.

 It should be added that "the question of adequacy of price remains for consideration after sale and on motion to confirm." American Brake Shoe & Foundry Co. v. Interborough Co., 2 Cir., 99 F.2d 789, 792.