**BONDHOLDERS, Inc., v. POWELL et al.**

No. 6224.

United States Court of Appeals
Fourth Circuit.

Argued April 5, 1951.

Decided June 1, 1951.

Aubrey R. Bowles, Jr., Richmond, Va., and Frank K. Sloan, Columbia, S. C. (Paul A. Cooper, Frank B. Gary, Jr., Cooper & Gary, all of Columbia, S. C., and Bowles, Anderson & Boyd, Richmond, Va., on brief), for appellant.

W. R. C. Cocke and James B. McDonough, Jr., Norfolk, Va. (Harold J. Gallagher and Leonard D. Adkins, New York City, on brief), for appellees.

Before PARKER, SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

Bondholders, Inc., the holder of certain Adjustment Mortgage Bonds of the Seaboard Air Line Railway Company, proposes in effect in this case to reopen and modify a plan of reorganization of the Railway Company under which a transfer of the railroad properties was made to Seaboard Air Line Railroad Company, a new corporation, on July 31, 1946. The proposal relates to the disposition of certain assets which have come into the hands of the receivers since the properties were sold and transferred to the New Company, and the claim is that the holders of the Adjustment Bonds, who were excluded from the Plan, should now be allowed to participate.

The Old Company had been in an equity receivership in the District Court and had been operated by the receivers since December 23, 1930. Its corporate structure was exceedingly complicated and extended studies and proposals for reorganization had been under consideration since 1935 but had been deemed impracticable because of prevailing adverse economic conditions. In 1939 a Special Master was appointed by the court to prepare and submit a Plan, and finally, on July 20, 1943, after prolonged study and many hearings in which all interested parties were invited to participate, he submitted a report which became the basis of a Plan which was approved by a decree of the court on December 10,

1943, as will appear from the exhaustive opinion of Judge Chesnut in Guaranty Trust Co. v. Seaboard Ry. Co., D.C.E.D. Va., 53 F.Supp. 672, which was affirmed by this court sub nomine, Badenhausen v. Guaranty Trust Co., 4 Cir., 145 F.2d 40.

The Plan called for the formation of a New Company to purchase the railway property and other assets of the Old Company, and to issue securities in payment therefor. A Reorganization Committee was appointed to execute the Plan, a deposit agreement providing for the deposit with the Committee of the securities entitled to participate was executed, and the Interstate Commerce Commission gave its approval to the deposit agreement, and authorized the New Company to issue the new securities in the sum of $185,000,000 as contemplated by the Plan, and to acquire and operate the railroad property. See 257 I.C.C. 837; 257 I.C.C. 683. Depositories were accordingly set up and on April 12, 1945, after sufficient securities had been deposited, a final decree of foreclosure of the mortgages, fixing an upset price of $52,000,000 for the property, was entered, as will appear from the opinion of the District Court in Guaranty Trust Co. v. Seaboard Air Line Ry. Co., D.C.E.D.Va., 60 F.Supp. 607.

The Reorganization Committee entered into a Reorganization Agreement with the New Company on May 25, 1945 wherein the Committee agreed to purchase the railroad property for the New Company at the foreclosure sale. The agreement provided that the Committee would also bid for any other property of the Railway Company which might be offered for sale pursuant to any subsequent supplemental order or decree which might be entered, and that all property purchased by the Committee at any sale should be transferred to the New Company; and that the Committee would pay to the New Company any cash it might receive in respect to any deposited bonds, either out of assets not sold pursuant to the decree, or out of the proceeds of sale of such assets, and that the Committee would pay the purchase price of all the property as far as possible by the use of deposited bonds. The

New Company agreed to pay the balance of the purchase price, if any were needed, and to assume all obligations and liabilities under the provisions of the decree or any subsequent order of the court; and also agreed to issue to the Reorganization Committee the new securities under the Plan in respect of the deposited bonds, and from time to time to issue any securities under the Plan in respect to any additional bonds which might thereafter be deposited.

In accordance with this agreement, the Committee secured the deposit of mortgage bonds of various issues, and purchased the railroad property at the foreclosure sale on May 31, 1945 for $52,000,500. The transfer of the property was not made until July 31, 1946 on which date the New Company issued its securities as called for by the Plan. In the meantime the railroad was operated by the receivers at their own risk. The purchase of the properties and the issuance of the new securities were made with the approval of the Interstate Commerce Commission set out in 261 I.C.C. 689, 726. The new securities have since found their way into the hands of numerous investors.

The Adjustment Bondholders were of necessity excluded from participation in the Plan and in the distribution of the securities of the New Company because the Old Company was insolvent in every sense of the word and its assets were insufficient to satisfy prior mortgage claims in full. The Railway Company operated over four thousand miles of railroad of which over two thousand miles were subject to ten separate underlying divisional mortgages of the aggregate sum in principal and interest on January 1, 1943, of $48,549,767.20. Subordinate to these underlying liens, but constituting first liens on certain portions of the railway system, were four general mortgages: (1) First Mortgage 4% Bonds due April 1, 1950; (2) Refunding Mortgage 4% Bonds due October 1, 1959; (3) Adjustment Mortgage 5% Bonds due October 1, 1949; (4) First and Consolidated Mortgage 6% Bonds due September 1, 1945. The total principal and interest of these general mortgage bonds publicly held aggregated $160,439,473.33. In addition there

were collateral trust obligations of the Railway, receivers' obligations and secured debts of subsidiaries, making a grand total of principal and interest of secured debt in the hands of the public of $340,251,484.64. See Badenhausen v. Guaranty Trust Co., 145 F.2d 40, 44. There were also unsecured debts in the sum of $1,193,723.97 and preferred and common stock of the par value of $85,000,000.

The Adjustment Mortgage was therefore subordinate not only to the divisional mortgages but also to the First Mortgage and the Refunding Mortgage. It was executed on October 1, 1909 and by its terms it created a lien, immediately subordinate to the lien of the Refunding Mortgage upon property which was subject to the lien of the Refunding Mortgage and upon no other property. The original issue amounted to $25,000,000. It was an Income Mortgage with interest payable only as earned. Of the total issue $22,500,000 came into the hands of the Old Company in the course of certain corporate adjustments, so that only $2,500,000 remained outstanding in the hands of the public at the time of the receivership; but the $22,500,000 was part of the property sold at the foreclosure sale on May 31, 1945, and is now owned by the New Company. Bondholders, Inc., the appellant, is a corporation formed in 1950 to acquire the Adjustment Bonds and has acquired $1,138,000 thereof during the year. Its shareholders are former Adjustment bondholders who acquired the securities during the past fifteen years at a fraction of their par value.

In view of the situation thus depicted, it was determined by the Special Master and by the District Court, and approved by this court, that neither the stockholders, preferred and common, nor the holders of the Adjustment Bonds were entitled to participate in the Plan. Indeed it was found that the securities to be issued by the New Company were insufficient in amount to satisfy in full the claims of the holders of the Refunding Bonds. No exceptions were filed by any holder of the Adjustment Bonds to the Plan within the time allowed therefor by the court; but during subsequent hearings leave was given to certain Adjustment bondholders to file exceptions and to submit evidence. They offered no evidence but submitted a brief which was considered by the court. In overruling the exceptions Judge Chesnut said in his opinion in 53 F.Supp. at page 681: "I cannot find any legal or equitable basis in support of the exceptions. It is not disputed that the bonds have no lien except that wholly subordinate to the Refunding 4's, and it is also clear that the claim on the Refunding 4's is not fully satisfied by the allocation of new securities. As will appear from the annexed tabulation showing the final allocation of new securities, the total claim, principal and interest, of the Refunding 4's amounts to $36,127,360.36. The total par value of all new securities allotted to Refunding 4's is only $18,760,186. While the Consolidated 6% mortgage is subsequent in point of time, and after the further and final consolidation of 1915, it is not shown that the Adjustment 5's have any lien on the property, mostly collateral, securing the 6's. With regard to the contention that the present large System earnings justified some recognition of the Adjustment 5's, it is sufficient to say that there is certainly no evidence before the court from which it can be found that the Adjustment 5's have a legal or equitable claim to any accumulated income as there is not a sufficient amount thereof to satisfy the claim of the Refunding 4's, and indeed no mortgage foreclosure proceeding asking impounding of income has been filed by the trustee for the Adjustment 5's.

No appeal was taken by any holder of Adjustment Bonds from this adjudication. Nor was there any attempt on the part of the Adjustment bondholders at that time to establish a claim under their mortgage. No proceeding was taken by the Fidelity Trust Company, trustee of the mortgage, or by the bondholders to foreclose the mortgage or to establish a lien on the income of the Old Company under the mortgage. On the contrary the trustee suffered a decree pro confesso to be taken against it when made a party to the proceeding to foreclose the other mortgages.

The priority of the other general mortgages was adjudicated by the foreclosure decree. No appeal from this decree was taken by any party.

Subsequently certain Adjustment bondholders, including some interested in the instant case, made an attempt to share in the assets of the Railway Company claiming that certain money which was in the hands of paying agents for the payment of interest coupons on the Adjustment Bonds when the receivers were appointed on December 23, 1930 should be used in the payment of accrued interest on the Adjustment Bonds. This claim was denied by an order of the District Court which was affirmed by this court in Blackford v. Powell, 4 Cir., 151 F.2d 392. Beside holding that there was no merit in the bondholders' petition we said, at page 395 of 151 F.2d: "The conclusive answer to the appeal, however, is the patent fact that it is an attempt to set aside the plan of reorganization formulated after years of careful investigation and approved by the District Court and by this court on appeal. No satisfactory excuse or explanation for so extraordinary an effort has been or can be made."

The present controversy grows out of two sales and transfers of assets by the receivers to the New Company which took place after it had taken over the railroad and had issued its securities to the bondholders of the Old Company. On March 28, 1947 Order 442A of the District Court directed the sale and transfer from the receiver to the New Company of assets in the sum of $10,045,270.66. No appeal from this order was taken and it was put into effect. On October 25, 1950 Order 451A of like effect directed the sale and transfer of assets in the sum of $6,338,838.-77. From this order the instant appeal was taken. In each instance payment for the assets transferred was made by crediting the amount of the purchase price upon the unpaid indebtedness of the Old Company represented by bonds on deposit with the Reorganization Committee and bonds in the hands of bondholders entitled to participate in the Plan who had failed to deposit their securities. An appropriate amount representing the distributive share of each bond was endorsed on the deposited bonds or added to the amount to be paid in cash by the New Company to the non-assenting bondholders upon the final consummation of the Plan. In other words, the transfer of these assets was made and the purchase price was paid in the same way that the sale of the railroad property was made under the decree of foreclosure; and the share of the participating bondholders in the assets of the debtor was correspondingly increased.

The $10,000,000 of assets sold under Order 442A consisted of earnings of the receivers in the operation at their own risk of the Railroad between May 31, 1945, when the foreclosure sale took place, and July 31, 1946, when the settlement took place in accordance with the Plan. These earnings under the terms of the foreclosure decree belonged to the receivers, subject to the rights of the mortgages. The amount of the earnings, due in large part to the war, was in excess of the amount estimated by the District Court in its opinion approving the Plan. The $6,000,000 of assets sold under Order 451A (which comprises the greater part of the remaining assets of the Old Company) consists of tax refunds paid to the receivers by the United States for which application had been made before the consummation of the Plan, but which were excluded from the foreclosure sale because they were of uncertain value and were not assignable under the federal statutes. The sum involved represented income of the Old Company for the years 1943 and 1944 which had been impounded by orders of court and made subject to the liens of the various mortgages.

The additional assets which have come into the hands of the New Company from these two sources substantially increased the assets of the Old Company available for the payment of its secured creditors over and above the amount available for this purpose when the Plan was confirmed, and the Adjustment bondholders now contend that the court should consider the question anew and should allow them to share in these assets rather than transfer them to the New Company in consideration

of the cancellation *pro tanto* of the old debt. The basic contention is that the claims of all prior bonds, except the Refunding Bonds, have received full compensatory treatment as required in Group of Inst. Investors v. Chicago, M. St. P. & P. R. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959, and that the balance of the claim of the Refunding Bonds and the claim of the Adjustment Bonds could also be satisfied if the method used in the first distribution of securities by the New Company upon the confirmation of the foreclosure sale were adopted in respect to the $10,000,000 and $6,000,000 funds. By the foreclosure sale $52,000,500 of property was transferred in consideration of the issuance of securities of the New Company in the sum of $185,000,000 and the assumption by the New Company of $11,870,000 of Receivers' Certificates, that is, $196,870,-000 in all. Thereby, it is claimed, a ratio of 3.78 to 1 was established; and if this ratio is applied to the assets covered by Orders 442A and 451A, the New Company would be justified in issuing additional securities in the respective par values of $37,860,000 and $24,000,000, or $61,860,000 in all; and this sum would be enough to satisfy the remainder of the claims of the Refunding Bonds and also the claims of the outstanding Adjustment Bonds. The appellant, however, does not expect the New Company to issue additional securities in the sum of $61,860,000; rather it insists that the holders of the Adjustment Bonds should receive in lieu thereof a cash sum in the ratio of 1 to 3.78 of the amount of the new securities to which the Adjustment Bonds would be entitled under its theory. The appellant estimates that this cash sum would range from $1,322,751 to $11,500,000, depending upon the amount of the Refunding Bonds entitled to participation. The appellant suggests various figures as to the amount entitled to participate which need not now be described.[1]

It is apparent that this proposal would require a substantial modification of the Plan which has long since been confirmed after careful study by the court and has gone into actual execution. It is equally clear that the proposal is based upon a misunderstanding of the effect of the Plan and its relation to the participating bondholders and the New Company. The appellant assumes not only that all the claims of the participating bondholders, prior to the Refunding bondholders, have been fully satisfied and that the claims of the Refunding bondholders have been satisfied to the extent of 53% of the total but that the unsatisfied claims no longer exist. That, however, is not the case. It is true that the holders of bonds who deposited them with the Reorganization Committee have accepted securities of the New Company in exchange for their former holdings and that the New Company holds the transferred property free from the liens of the old mortgage, and that the Plan contemplates that upon its consummation the bonds shall be surrendered to the Reorganization Committee and the mortgages shall be released of record; but the deposit agreement expressly provides that the deposited bonds "shall remain in full force and effect for all purposes and shall not be deemed to have been merged, satisfied, released or discharged of, and no right or lien shall be deemed released or waived in respect of any such securities, and any judgment upon any claims (including claims and judgments for deficiencies), and all liens and equities, shall remain unimpaired and may be enforced by the Committee and

1. This argument seems to assume that all bonds prior to the Refundings have been fully paid, for otherwise the Refundings could not have participated in the Plan. The fact is that the prior debts have not been paid in full and the Refundings were admitted because they were secured by senior liens on certain properties and by pledged senior securities. The argument also assumes that securities of the New Company at their par value of $61,860,000 would be more than enough to pay the balance due on the Refunding Bonds; but this is not correct since the total Refunding debt, principal and interest, amounted to $168,-000,000 of which only a small fraction has been paid. The argument ignores the fact that no appeal was taken from Order 442A, and that it has been put into effect.

its successors or assigns until paid or satisfied in full or expressly released by or with the consent of the Committee." It is plain from this provision that the Reorganization Committee became the owner of the bonds deposited under the Plan and is entitled to all the rights and equities pertaining to the deposited bonds. Hence the unpaid indebtedness on the old bonds is due and owing to the Committee and may be used by it to purchase additional assets of the Old Company under the direction of the court.

The provisions of the final decree of foreclosure of April 12, 1945 are in harmony with this view. Article XVIII of the decree provides that the purchaser (in this case the Reorganization Committee acting for the New Company), shall be credited on account of the purchase price for bonds turned over in payment of the purchase price, and that the Special Master shall credit upon each bond the amount applicable thereto; and in case the bond shall not be paid in full, the Special Master shall stamp upon it the amount credited thereon. This procedure was followed in the case of the Refunding Bonds, and as the result of the foreclosure sale there was credited upon each $1,000 bond the distributive share of $249.10 (see 261 I.C.C. 689, 726). This distributive share will be increased to the sum of $327.04 per bond through the allocation of the additional sums of $10,000,000 and $6,000,-000 covered respectively by the sale in 1947, under Order 442A, and the sale in 1950, under Order 451A. The total credit however, of $327.04 is less than one-sixth of the total claim, including interest, on each $1,000 Refunding bond which on March 31, 1946 amounted to $2,089.27.[2] Obviously the inclusion in the assets of the Old Company of the sums represented by Orders 442A and 451A would not have

justified the admission of the Adjustment Bonds to participation in the Plan even if these assets had been on hand when the Plan was formulated.

The distributive value of the undeposited bonds, which did not participate but will be paid in cash by the New Company at the final culmination of the Plan, was arrived at in the same manner. Accordingly, there has been credited upon each $1,000 Refunding Bond, which was not deposited under the Plan, the sum of $327.-04. It is of course impossible to argue that these bonds have been satisfied by the issuance of new securities, which the nonassenting bondholders did not accept.

It is equally clear that the ratio of 3.78 to 1, upon which the appellant's contention rests, that is, the ratio of the par value of the new securities to the purchase price of the Old Company's assets, has no bearing upon the point at issue. The capitalization of the New Company was determined by estimating its probable earnings of the several lines in the future, and not by the value of the mortgaged property. The new securities were allocated to the participating creditors in accordance with complicated formulas based on the respective segregated earnings, freight business and value of plant of the separate divisions of the Railway. This allocation adhered to the full priority rule[3] and preserved the priority rights of creditors, *inter sese,* by giving them an equitable equivalent of their claims. It was not intended to extinguish the old debt, which was paid only to the extent possible by crediting thereon the value of the assets of the Old Company. To each mortgage was allocated a certain amount of the new securities, using their estimated value as of March 15, 1945, and a certain part of the value of the company's assets was credited upon the mortgage debt. The ratio of the par value of the

2. The total amount of the principal and interest due and owing on the Refunding Bonds on April 12, 1945, the date of the foreclosure decree, was $168,-348,953.05, and it was so adjudicated in the decree. Art. VI, 6, 8. Of the principal amount of these bonds, $65,915,000 were pledged as security for the pay-

ment of the First and Consolidated Mortgage, but they were nevertheless determined to be outstanding obligations of the Old Company. Foreclosure Decree Art. XXII, 22.1, 22.2, p. 189.

3. See, Northern Pac. Co. v. Boyd, 288 U. S. 482, 33 S.Ct. 554, 57 L.Ed. 931.

new securities to the value of the company's property did not affect the calculation.

The acquisition by the Old Company of additional assets after the confirmation of the Plan and sale of the property was not unexpected or overlooked in the formulation of the Plan, as the appellant's argument seems to suggest. Section 18.14 of the decree makes the following provision: "All property in the hands of the Receivers after Delivery Date and after the completion of the accounting to be made pursuant to the foregoing paragraph 18.9 shall be dealt with as the Courts may hereafter direct, and the Courts reserve jurisdiction for that purpose." Orders 442A and 451A were passed pursuant to this provision, and the action of the court in each instance in directing that the additional assets should be applied (in the same manner as the assets sold in 1945) to the payment of the debt first entitled, was not only in complete harmony with the Plan but was equitable and just under the admitted facts. It is true that the earnings of the Railroad between the foreclosure sale and the settlement date exceeded expectations, and that the tax refund was made in settlement of a doubtful claim. Nevertheless, the additional assets are insufficient to pay the debts having priority to the Adjustment Bonds and there will still remain an indebtedness thereon for which a deficiency judgment may be taken under the express provisions of Article XXII of the foreclosure decree.

It is of great significance that the claims of the Adjustment bondholders have been barred by Article XIX of the foreclosure decree. Therein it was provided that notice having been given to all creditors to file claims and demands, and the time for filing having expired, all claims and demands which had not been filed (with certain exceptions irrelevant here) should be finally barred and foreclosed, and should not be enforced against the receivers or against assets in their hands or against the property sold, or against the purchaser; and no holder of any such claim or demand should be entitled to any right under the decree or be entitled to share in the distribution of the proceeds of the sale of the property directed to be sold, or of any other funds or property distributable in the cause. No claim was filed by any holder of the Adjustment bonds and they are therefore subject to the bar of the decree. Moreover, as we have seen, no steps were taken to establish a lien under the adjustment mortgage and the priority of the other general mortgages was finally adjudicated in the foreclosure decree.

It might well be argued that these adjudications and the confirmation and effectuation of the Plan are in themselves conclusive of the appellant's claim; cf. In re Diversey Bldg. Corp., 7 Cir., 141 F.2d 65. We need not base our decision, however, on the principle of res ad judicata, for even if it lies within the power of the courts to reopen the proceeding, it is obvious that it should not be done in this case. To open a plan of railroad reorganization accepted and confirmed after years of consideration requires a showing of substantial injustice, and unless it can be demonstrated that senior creditors have received more in value that the amount of their claims, courts will not reexamine the plan upon the complaint of junior interests, even though the plan has not been executed. See, Ins. Group Committee v. Denver & Rio Grande W. R. Co., 329 U.S. 607, 618, 67 S.Ct. 583, 91 L.Ed. 547; Reconstruction Finance Corporation v. Denver & Rio Grande W. R. Co., 328 U.S. 495, 66 S.Ct. 1282, 1384, 90 L.Ed. 1400; Group of Investors v. Chicago, Milwaukee, St. Paul & Pac. R. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959; Ecker v. Western Pac. R. Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892; In re Deep Rock Oil Corp., 10 Cir., 113 F.2d 266, certiorari denied sub nom. Standard Gas & Elec. Co. v. Taylor, 311 U.S. 699, 61 S.Ct. 138, 85 L.Ed. 453.

Affirmed.